689 A.2d 132

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. RICHARD A. BARONE, DEFENDANT–RESPONDENT.

Argued November 19, 1996—Decided March 10, 1997.

See also: 781 F.Supp. 1072.

600

601

*Janet Flanagan*, Deputy Attorney General, argued the cause for appellant (*Peter G. Verniero*, Attorney General of New Jersey, attorney).

*J. Michael Blake*, Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner*, Public Defender, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

The issue raised in this appeal is whether a determination by a federal district court judge that a good faith breach of a federal plea agreement resulting from Federal Bureau of Investigation ("FBI") agents disclosing to state law enforcement officials statements made by a defendant respecting his involvement in two

casino thefts, requires dismissal of a state indictment on charges related to the casino thefts.

The Law Division conducted an evidentiary hearing to determine whether to dismiss the indictment. At the conclusion of that hearing the court denied defendant's motion, concluding that defendant had not disclosed the casino theft information to FBI agents, and that the State had obtained the evidence that led to the state indictment from sources wholly independent of defendant's disclosures to FBI agents.

Defendant was convicted by a jury of all of the offenses related to the casino thefts, conspiracy, and other offenses as well. The Appellate Division reversed defendant's casino theft and conspiracy convictions in a published opinion, holding that principles of fairness required the New Jersey Attorney General to participate in the federal hearing because it had knowledge of the hearing. 288 *N.J.Super.* 102, 671 *A.*2d 1096 (1996). We granted certification, 144 *N.J.* 589, 677 *A.*2d 762 (1996), and now reverse.

I

-A-

The facts giving rise to this appeal are somewhat bizarre. Defendant had an erratic romantic relationship with Pamela Costello. According to Costello, defendant coerced her into stealing approximately $22,495 from Harrah's at Trump Plaza Casino/Hotel, where she worked as a cage cashier, on November 17 1985, and approximately $24,818 from the Golden Nugget Hotel/Casino ("Golden Nugget"), where she held a similar position, on June 15, 1986. During the period between the thefts and November 1989, the New Jersey Division of Criminal Justice, Casino Protections Section, considered Costello the primary suspect in the casino thefts. The same authorities also suspected that defendant might have played some role in the thefts.

There is substantial evidence to support Costello's testimony that she did not report the thefts because she feared that defen-

dant was involved in organized crime. The fear was reinforced on several occasions when defendant physically abused her, threatened to kill her, and threatened to physically harm members of Costello's family.

### -B-

In an unrelated criminal proceeding, defendant and Joseph Merlino were indicted by a federal grand jury in the Eastern District of Pennsylvania for conspiracy, theft from an interstate shipment, and participating in a 1987 theft of money from an armored truck during an interstate shipment. On November 3, 1989, defendant entered into a written plea agreement with the federal prosecutor pursuant to *Rule* 11(e) of the Federal Rules of Criminal Procedure. In addition to agreeing to testify against Merlino, the plea agreement, in pertinent part, provided:

6.

 (b) It is agreed, in exchange for promises set forth below, that the defendant will cooperate fully and truthfully with the Government as follows:

 (1) The defendant agrees to be fully debriefed concerning his knowledge of, and participation in, the theft of currency from an armored truck on September 23, 1987 and any other crimes about which he has knowledge.

 (6) The defendant agrees that since his acceptance of this agreement terminates all plea discussion with the government, any statements made by him after the date of his acceptance of this agreement are not governed by Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410.

 (c)

 (2)

 (e) It is agreed that the government will bring no additional charges against the defendant for criminal conduct related to activity which he has disclosed during proffer sessions with federal agents prior to the entry of his guilty pleas.

In order for the government to evaluate whether the plea agreement was worth pursuing further, a meeting was held on

November 2, 1989, one day before the plea agreement was signed. Defendant, his attorney, Assistant United States Attorney Robert Goldman, and FBI Agents Donald Rochon and Robert Bazin participated in that meeting which they identified as a proffer session. Following the proffer session, defendant entered guilty pleas to the conspiracy and theft charges, and agreed to cooperate fully and truthfully with the federal government. In exchange for the guilty pleas and defendant's cooperation under the agreement, the federal prosecutor agreed to dismiss the remaining count of the indictment, to "provide the defendant with the opportunity to apply for admission to the federal witness protection program," and to advise the sentencing court of defendant's good faith cooperation.

The extent of the information discussed at the proffer session is disputed. Defendant and his attorney assert that defendant disclosed information regarding the casino thefts. However, no official transcript of the proffer session was made, or at least no transcript is available to state courts or the parties to either verify or refute defendant's assertion. In any event, defendant was sentenced by the federal court to a custodial term of one year and one day for conspiracy and three years of probation for theft.

-C-

While defendant was serving his federal sentence, he was indicted in November 1990 on multiple counts by a New Jersey state grand jury for charges stemming from the casino thefts: one count of third-degree conspiracy to commit theft, a violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:20–3; two counts of third-degree theft by unlawful taking, a violation of *N.J.S.A.* 2C:20–3; and two counts of third-degree criminal coercion, a violation of *N.J.S.A.* 2C:13–5a(1).

As a result of the state indictment, defendant's enrollment in the Federal Witness Protection Program was barred. Defendant then sought to gain admission to the program by filing a motion with the federal court, claiming that he had been barred from the

program because the federal government had breached the federal plea agreement by providing information, disclosed during the proffer session, to the New Jersey authorities that led to the state indictment.

Defendant's application for relief was heard by the federal judge in the Eastern District of Pennsylvania who had accepted his plea and sentenced him. The federal court conducted an evidentiary hearing to determine whether the federal plea agreement had been breached. A New Jersey Deputy Attorney General attended a portion of the hearing but did not participate or otherwise seek to intervene. After conducting an *in camera* review of the FBI's files and hearing testimony in open court, the federal court found that defendant had disclosed his involvement in the casino thefts during the proffer session. *United States v. Barone*, 781 *F.Supp.* 1072, 1075 (E.D.Pa.1991). The court found that the federal government had breached the plea agreement by disclosing defendant's proffered testimony to New Jersey authorities. *Id.* at 1075–79. The court reasoned that the agreement implicitly provided that the federal government would not take actions likely to result in defendant's prosecution in other jurisdictions. *Id.* at 1074.

The federal court rested its finding of breach primarily on circumstantial evidence. The court noted that New Jersey's investigation of defendant had significantly intensified during the period from November 2, 1989, the date of defendant's proffer session, to January 10, 1990, the date defendant admitted participating in the casino thefts while testifying for the government in the federal trial against Joseph Merlino pursuant to the plea agreement. *Id.* at 1075–76. The court found that "[t]he FBI agents in Philadelphia who were privy to Mr. Barone's disclosures kept their fellow agents in southern New Jersey informed of the case developments." *Id.* at 1075.

The federal court found that retired FBI agent, Jack Tuttle, who was the director of surveillance for Bally's Grand Casino, the successor to the Golden Nugget, had made several inquiries

regarding defendant's case between the time defendant had been arrested and the time he had testified against Merlino. *Ibid.* The court found that Tuttle had met with Investigator Carl Gravel of the New Jersey Division of Criminal Justice, Casino Protections Section, to review surveillance tapes recorded on the date of the Golden Nugget theft. *Ibid.* In addition, the court found that after defendant's testimony in the Merlino trial on January 10, 1990, Tuttle had received a telephone call from "a federal law enforcement agent concerning [defendant's] testimony," and that Tuttle shared the information with Investigator Gravel. *Id.* at 1076.

As a remedy for the breach, the court ordered the FBI and the United States Attorney's Office not to provide any further assistance to the New Jersey authorities with respect to the casino thefts. *Id.* at 1079. The court also ordered that defendant be afforded some form of witness protection at "an appropriate time." *Ibid.* The federal court acknowledged that it could not enjoin defendant's New Jersey criminal prosecution "without proof of bad faith or irreparable injury exceeding that attendant to every criminal prosecution." *Ibid.* (citing *Younger v. Harris,* 401 *U.S.* 37, 91 *S.Ct.* 746, 27 *L.Ed.*2d 669 (1971)). It found that such proof did not exist. *Ibid.*

-D-

Defendant filed a motion to dismiss his state indictment, claiming that federal agents had breached the plea agreement by disclosing information about the casino thefts to the New Jersey authorities, and that such disclosures had led to his state indictment. Six days after the federal court's decision and order were entered on December 13, 1991, the state trial court conducted an evidentiary hearing to determine whether to dismiss defendant's indictment. No transcript of the testimony presented in the federal court hearing was available. The trial court disagreed with the federal court's conclusion that defendant had disclosed his involvement in the casino thefts at the proffer session. The court observed that FBI Agent Rochon's notes from the proffer session

made no reference to the casino thefts. That was significant because Rochon's memorandum to the file specifically indicated that defendant would later discuss La Cosa Nostra gambling, the Junior Black Mafia, false accident claims, and influencing members of the Philadelphia Flyers hockey team.

The trial court concluded that the only reference to defendant's alleged disclosures of his involvement in the casino thefts was a certification by defendant's former attorney, dated approximately twenty months after defendant had testified in the Merlino trial and twenty-two months after the proffer session. The court found that the certification was not credible. That certification, dated August 28, 1991, stated that "[a]mong the matters disclosed by Mr. Barone during [the proffer session] were thefts involving large sums of money from casinos in Atlantic City." The Law Division concluded that because the evidence relied upon by the federal court was not credible, the federal court's determination that defendant had disclosed information about the casino thefts during the proffer session was not entitled to any deference. The Law Division found that defendant had first admitted his involvement in the casino thefts on January 10, 1990, during the federal trial of Joseph Merlino.

Moreover, the trial court concluded that the State's evidence was obtained from sources and by means entirely independent of defendant's alleged disclosure of the casino thefts during the proffer session. That conclusion was based in part on the testimony of several witnesses, including Investigator Gravel. He testified that defendant and Costello had been the only suspects in the investigation of the casino thefts, and that his supervisor had ordered him to subpoena Costello's tuition records from the university she was attending to investigate the possibility that she had used proceeds from the casino thefts to pay her tuition. After her records were subpoenaed, Costello became the State's primary witness against defendant. In her affidavit of September 1991, Costello stated that having her tuition records subpoenaed had prompted her to seek legal counsel, and that she had decided to

cooperate with New Jersey authorities to seek protection from defendant and protect her medical career by clearing her name. Costello claimed that she had learned of defendant's testimony in the Merlino trial, in which defendant implicated Costello and himself in the casino thefts, after she had decided to cooperate with the New Jersey authorities.

According to Gravel, he also contacted the State Police Officer who had been in charge of the investigation of the Golden Nugget theft to discuss the case and to review surveillance tapes recorded on the day of the Golden Nugget theft. Gravel testified that during the meeting the officer had called a representative from the Bally's (formerly the Golden Nugget) Surveillance Department, who had informed him that defendant had implicated himself and Costello on cross-examination at the Merlino trial. According to Gravel, the officer informed him of defendant's testimony and showed him a newspaper article, which stated that defendant had testified against Merlino regarding the 1987 armored truck incident. The information about defendant's testimony in the Merlino trial confirmed his suspicion that defendant and Costello had participated in the casino thefts.

Deputy Attorney General Smith of the Casino Protections Section, who served until January 1990, and his successor Deputy Attorney General Walls, testified that federal authorities had not directly or indirectly provided their section with information regarding defendant.

The trial court denied defendant's motion to dismiss, holding that the information obtained by "the New Jersey authorities came from either the detailed investigation made by Investigator Carl Gravel or the investigation that showed that the defendant Barone made those admissions while under cross-examination at the federal trial" of Merlino.

At the conclusion of a jury trial, defendant was convicted of third-degree conspiracy to commit theft by unlawful taking; two counts of third-degree theft by unlawful taking; and several offenses committed against Costello. The conspiracy count was

merged with the theft counts for sentencing purposes, and defendant was sentenced to concurrent four-year terms and ordered to pay $47,313 in restitution and a $30 per count Victims of Crime Compensation Board assessment.

## II

### -A-

First we address what, if any, preclusive effect should be accorded the federal court's determination that there was a good faith violation of the federal plea agreement. The Appellate Division reversed defendant's convictions for the casino thefts and conspiracy because the Attorney General of New Jersey declined to participate in the federal court hearing that resulted in a determination that the plea agreement had been violated. 288 *N.J.Super.* at 124, 671 *A.*2d 1096. The Appellate Division ruled that because the Attorney General was aware of the federal hearing and "elected not to directly participate or seek to participate, either before the federal judge rendered her findings or by any endeavor to challenge them thereafter," the state judge was bound to accept the federal court's findings. *Ibid.* Consequently, the Appellate Division found that the federal court's finding totally barred litigating in state court whether the indictment was based on a violation of the federal plea agreement. *Ibid.*

The State argues that the federal court's findings should have no preclusive effect on the state court criminal proceedings. It maintains that the State was not obligated to participate in the federal hearing and that the federal court lacked jurisdiction to prevent the State from proceeding with the indictment and trial in state court.

The essence of defendant's argument that the federal court's finding that the plea agreement was breached requires dismissal of the indictment, in whole or in part, is the implied premise that the federal plea agreement was a grant of immunity that was binding on the State. Both the federal and state courts

considered and rejected interpreting the plea agreement to be a grant of immunity. *Barone, supra,* 781 *F.Supp.* at 1078; 288 *N.J.Super.* at 116, 671 *A.*2d 1096. Rather than a grant of immunity, the plea agreement was a promise not to prosecute. *Barone, supra,* 781 *F.Supp.* at 1078. Indeed, the language in the agreement dictates that conclusion. Paragraph 6(c)(2)(e) of the plea agreement provides "that the government will bring no additional charges against the defendant for criminal conduct related to activity which he has disclosed during proffer sessions with federal agents prior to the entry of his guilty pleas." Clearly, that language creates an agreement not to prosecute, which is not a grant of immunity. Absent a grant of immunity, the federal plea agreement does not directly bar derivative use in state courts of defendant's testimony given at proffer sessions. *Murphy v. Waterfront Comm'n,* 378 *U.S.* 52, 78–79, 84 *S.Ct.* 1594, 1609, 12 *L.Ed.*2d 678, 694–95 (1964).

■ We reject the Appellate Division's implication that the State was obligated to participate in the federal hearing. The State was not a party to the plea agreement and did not participate in the proffer session. Only the United States Attorney and FBI agents participated in the proffer session. Paragraph 6(c)(2)(e) of the agreement provides that only the *"government* will bring no additional charges against the defendant" for disclosures made during the proffer session. (Emphasis added). Thus, the agreement did not purport to bind any jurisdiction except the federal government.

■ Furthermore, the United States Attorney for the Eastern District of Pennsylvania had no authority to bind any state prosecuting authority in New Jersey. Absent consent or participation by state authorities in the plea agreement, federal prosecutors cannot bind state prosecutors and vice versa. The State did not participate in negotiating defendant's plea agreement, and there is no evidence of any agency relationship between the State and the United States Attorney. Nor can it be said that the State, in bringing its prosecution, was a tool of the federal government.

It has not been asserted that the casino thefts violated any federal law, and the State's prosecution was not a sham. *Bartkus v. Illinois*, 359 *U.S.* 121, 123–24, 79 *S.Ct.* 676, 678, 3 *L.Ed.*2d 684, 687 (1959); *see also United States v. Sparks*, 87 *F.*3d 276, 279 (9th Cir.1996) (holding that state prosecutor cannot bind federal government); *United States v. Cordova–Perez*, 65 *F.*3d 1552, 1554 (9th Cir.1995) (holding that state prosecutor cannot bind federal government where federal government is not party to plea agreement), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 113, 136 *L.Ed.*2d 65 (1996); *Stephens v. Attorney Gen.*, 23 *F.*3d 248, 249 (9th Cir.1994) (holding that state is not bound by results of federal evidentiary hearing where no privity between state and federal prosecutors existed); *United States v. Fuzer*, 18 *F.*3d 517, 520 (7th Cir.1994) (holding that state prosecutor cannot bind federal prosecutor absent knowledge and consent); *Wisconsin v. Mechtel*, 176 *Wis.*2d 87, 499 *N.W.*2d 662, 667 (1993) (finding that state and federal governments are separate sovereigns and that neither can bind other without consent).

 . Under the doctrine of "dual sovereignty," the state and federal governments have the power to prosecute separately for the same acts. *United States v. Wheeler*, 435 *U.S.* 313, 316–20, 98 *S.Ct.* 1079, 1082–84, 55 *L.Ed.*2d 303, 308–11 (1978); *United States v. Davis*, 906 *F.*2d 829, 832 (2d Cir.1990). As a corollary of the dual sovereignty doctrine, collateral estoppel does not bar a state prosecutor from using evidence previously suppressed in a federal proceeding in which the state prosecutor was not a party. *Davis, supra*, 906 *F.*2d at 832; *see also* 5 Wayne R. LaFave, *Search and Seizure* § 11.2(g), at 101 (3d ed.1996) (emphasizing that deferring to federal prosecution does not make state a party to federal proceedings).

In this case, the State was not a party to the agreement, it did not participate, nor was it obligated to participate, in the federal hearing, it did not consent to be bound by the agreement, and no privity existed between the state and federal governments. For those reasons, we hold that the State was not bound by the

outcome of the federal hearing. To hold otherwise would mean that federal prosecutors would be able unilaterally to usurp state prosecutorial discretion.

-B-

The Appellate Division also ruled that "as a matter of comity, the State judge should not have conducted an independent hearing on the same factual questions." 288 *N.J.Super.* at 124, 671 *A.2d* 1096. In relying on "comity" as a basis to reverse, the Appellate Division did not follow the federal court's ruling it purportedly was upholding. The federal court found that because there was no evidence that the violation of the plea agreement was in bad faith, comity prevented that court from enjoining the state court proceedings. *Barone, supra,* 781 *F.Supp.* at 1079.

The Appellate Division overstated the claim of comity:

Comity is not a rule of law, but one of practice, convenience, and expediency. It is something more than mere courtesy, which implies only deference to the opinion of others, since it has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question. But its obligation is not imperative.... Comity persuades; but it does not command.

[*Mast, Foos, & Co. v. Stover Mfg. Co.,* 177 *U.S.* 485, 488, 20 *S.Ct.* 708, 710, 44 *L.Ed.* 856, 858 (1900).]

Thus, comity is not "a binding obligation on the forum state, but a courtesy voluntarily extended to another [jurisdiction]." *City of Philadelphia v. Austin,* 86 *N.J.* 55, 64, 429 *A.2d* 568 (1981). Our policy against duplicative litigation, reflected in our entire controversy cases, does not require us to create, in a *de facto* sense, a new rule of comity. The Attorney General's failure to participate in the federal hearing does not evidence an intent to harass, gain undue influence over defendant, or act otherwise in bad faith.

Because the federal court found no bad faith violation of the plea agreement, and the violation caused defendant to suffer no irreparable harm beyond that attendant to every criminal prosecution, no basis exists for the State to terminate its prosecu-

tion based on comity. *Younger v. Harris,* 401 *U.S.* 37, 43–44, 91 *S.Ct.* 746, 750, 27 *L.Ed.*2d 669, 675 (1971); *Perez v. Ledesma,* 401 *U.S.* 82, 85, 91 *S.Ct.* 674, 677, 27 *L.Ed.*2d 701, 705 (1971); *United States ex rel. Birnbaum v. Dolan,* 452 *F.*2d 1078, 1079 (3d Cir.1971); *Sole v. Grand Jurors,* 393 *F.Supp.* 1322, 1327 (D.N.J. 1975); *cf. Breeden v. New Jersey Dep't of Corrections,* 132 *N.J.* 457, 469, 625 *A.*2d 1125 (1993) ("If the sentencing authority of the State is to yield to that of another state, then it must be with the concurrence of the sentencing authority of New Jersey.").

In the present case, the Law Division properly elected not to defer to the federal court given the fact that the federal court acknowledged that it could not enjoin the state prosecution. *Barone, supra,* 781 *F.Supp.* at 1079. Moreover, reversing defendant's convictions on grounds of comity would contravene the State's public policy, given the Law Division's conclusion that the indictment was based on evidence obtained independent of the good faith breach of the federal agreement found by the federal court. The Law Division undoubtedly was motivated to apply the independent source rule to make certain that defendant was not treated unfairly even if a good faith breach of the federal agreement had occurred.

-C-

The finding that the state indictment was based on information obtained independently of the proffer session disclosures provides another compelling reason not to ascribe any preclusive effect to the federal court finding of a good faith breach of the plea agreement. In applying the independent source doctrine, the trial court apparently relied on *Kastigar v. United States,* 406 *U.S.* 441, 92 *S.Ct.* 1653, 32 *L.Ed.*2d 212 (1972). *Kastigar* instructs that a prosecutor may rebut a defendant's claim that the prosecutor impermissibly used the defendant's compelled testimony in breach of a grant of use and derivative use immunity by showing that the disputed evidence was derived from "a legitimate source wholly independent" of the defendant's compelled testimony. *Id.* at 460,

92 *S.Ct.* at 1665, 32 *L.Ed.*2d at 226; *see also Wong Sun v. United States,* 371 *U.S.* 471, 484–86, 83 *S.Ct.* 407, 415–16, 9 *L.Ed.*2d 441, 453–54 (1963) (stating that physical and verbal evidence that is "fruit" of illegal government conduct must be excluded); *United States v. Quatermain,* 613 *F.*2d 38, 40 (3d Cir.1980) (explaining that government may prosecute using evidence derived from source wholly independent of disputed testimony).

 Because a grant of use and derivative use immunity does not confer upon a defendant a pardon or amnesty, *Kastigar, supra,* 406 *U.S.* at 461, 92 *S.Ct.* at 1665, 32 *L.Ed.*2d at 226, surely, then, a plea agreement that proscribes a prosecution based on a defendant's testimony disclosed during a proffer session does not grant the pardon or amnesty that defendant seeks in the present case. *See State v. Strong,* 110 *N.J.* 583, 595–96, 542 *A.*2d 866 (1988) (barring "prosecutorial use of any and all evidence that would not have been developed or obtained but for the compelled testimony"). Indeed, the federal judge was moved to find only a good faith violation of the plea agreement because the state indictment was not returned until November 1990, which was eleven months after defendant had testified under oath in a public trial that he had participated in the casino thefts. That testimony was a compelling piece of independent evidence. Consequently, even if there was a good faith violation of the plea agreement, under the independent source rule, defendant was not prejudiced in the state prosecution. *State v. Sugar,* 100 *N.J.* 214, 241–42, 495 *A.*2d 90 (1985).

 An appellate court's scope of review of the trial court's determination that the State's evidence was wholly independent of what defendant revealed at the proffer session is limited. We do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence. The test is "whether the findings made [by the trial court] could reasonably have been reached on sufficient credible evidence present in the record." *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). Our

review of the record persuades us that the test was satisfied in this case.

## III

The judgment of the Appellate Division reversing the convictions for theft and conspiracy is reversed.

HANDLER, J., concurring.

I join the Court in reinstating defendant's convictions and sentence. However, I do so solely because the State indictment was based on evidence independent of the circumstances surrounding defendant's federal plea agreement and the breach of that agreement. New Jersey law enforcement began to investigate Pamela Costello because of a suspicion that she was using funds that she had stolen from a casino to pay for her medical education. This investigation then led to defendant's implication in the crimes for which he was later indicted. Moreover, according to Costello, she began to cooperate with State authorities before she found out about defendant's testimony at the federal trial of Joseph Merlino. Because the State prosecution relating to the casino thefts was based on information provided by Costello, the information that the State may have obtained from defendant's federal testimony was not the source of the prosecution.

Despite my agreement with the Court's ultimate resolution of the case, however, I do not subscribe to its unnecessarily overstated holding regarding the determination of when a New Jersey court should defer to a federal court's factual findings. The Court, in validating the Law Division's refusal to defer to the federal findings, implicitly draws the startling conclusion that, when a criminal conviction is at stake, the only reason to afford comity to the factual findings of another jurisdiction is to neutralize bad faith on the part of prosecuting authorities. *Ante* at 613–15, 689 *A.*2d at 139–40. Thus, according to the Court, because the federal court in this case could not have enjoined the State prosecution under the principles enunciated in *Younger v. Harris,*

401 *U.S.* 37, 91 *S.Ct.* 746, 27 *L.Ed.*2d 669 (1971), the Law Division had no obligation to defer to that court's findings. *Ante* at 613–14, 689 *A.*2d at 140.

The Court does a disservice by converting the true statement that comity is not "a binding obligation," *City of Philadelphia v. Austin,* 86 *N.J.* 55, 64, 429 *A.*2d 568 (1981), into a presumption against comity if no bad faith has been shown. If the State prosecution in this case were not based on independent evidence (in other words, if the federal court's findings were relevant to the disposition of the case), I would hope that the Court would be truly reluctant to instruct New Jersey courts that they simply should disregard the findings of the court of another jurisdiction. I fear that lower courts may be tempted to do just that in future cases when the factual findings of other courts *are* relevant.

In this case, the federal court, after taking the exceptional step of conducting a plenary hearing into the alleged prosecutorial breach of defendant's plea agreement, determined that the government had violated at least the spirit of the agreement by divulging information to New Jersey authorities. *United States v. Barone,* 781 *F.Supp.* 1072, 1078 (E.D.Pa.1991). The court made extensive factual findings to that end. *Id.* at 1074–77. However, it determined that it lacked power to enjoin New Jersey from prosecuting defendant. *Id.* at 1079. This lack of power stemmed from the principle, as embraced repeatedly by the United States Supreme Court, that courts of different jurisdictions should respect each other's ability to decide issues. *E.g., Stone v. Powell,* 428 *U.S.* 465, 96 *S.Ct.* 3037, 49 *L.Ed.*2d 1067 (1976) (holding that federal courts hearing petitions for *habeas corpus* should defer to state-court Fourth–Amendment exclusionary rulings if state courts provided full and fair opportunity to raise issue); *Younger, supra,* 401 *U.S.* 37, 91 *S.Ct.* 746, 27 *L.Ed.*2d 669.

Yet, the federal court's lack of power to enjoin New Jersey from prosecuting defendant does not translate into a license for our courts to disregard the federal findings entirely. *See State v. Lueder,* 74 *N.J.* 62, 70, 376 *A.*2d 1169 (1977) (stating that, while

full faith and credit did not require deference to foreign criminal judgments, New Jersey courts ordinarily would defer to such judgments based on principles of comity).

Although the Law Division was not bound to accept the federal court's factual determinations, its decision not to accept them was unsupported by credible reasoning. The federal court provided thorough analysis, based on first-hand testimony, of the events surrounding the breach of the plea agreement by federal authorities, and the Law Division could not conceivably have done a better fact-finding job. Moreover, the federal court had the benefit of New Jersey law enforcement officers, who were present at the federal hearing and who were in an excellent position to inform the federal court of the adequacy and accuracy of that court's factual findings and to challenge those findings that the officers believed to be erroneous.

Considering the federal court's thorough treatment of the subject and the State's ample opportunity to affect that treatment, the Law Division simply had no sound reason to rebuff the federal court's determinations out of hand. Where one court has this type of advantage in the fact-finding process, deference is particularly appropriate. *Cf. State v. Marshall*, 244 *N.J.Super.* 60, 69, 581 *A.*2d 538 (Law Div.1990) ("[W]hile this court is not bound by the ... Oklahoma conviction, *it recognizes the superior position of the Oklahoma courts to render an assessment on the propriety of the judgment.*") (emphasis added). Yet, despite its inferior vantage point, the Law Division forged ahead, evincing an insensitivity to the very idea of comity and an obtuseness to the comprehensive factual determinations of another court.

While comity is not always a "binding obligation," nor is it a doctrine to be brushed aside lightly. We are but one component of a jurisdictional constellation that must function in unison if the American jurisprudential theory of multiple sovereignties is to succeed. We should be mindful of this abstract theory when we decide concrete cases.

Accordingly, I concur.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.