29 A.3d 347 (2011)
422 N.J. Super. 445
STATE of New Jersey, Plaintiff-Respondent,
v.
Joseph DIORIO, Defendant-Appellant.
No. A-4981-07T4.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 2011.
Decided October 20, 2011.
*349 Anil K. Arora argued the cause for appellant.
Frank J. Ducoat, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Mr. Ducoat, of counsel and on the brief).
Before Judges CARCHMAN, GRAVES and WAUGH.
The opinion of the court was delivered by
GRAVES, J.A.D.
On February 1, 2005, a State grand jury returned a six-count indictment charging defendant Joseph Diorio and co-defendant Michael Fava with the following offenses: first-degree conspiracy to promote or facilitate theft by deception, money laundering, misconduct by a corporate official, and witness tampering, in violation of N.J.S.A. 2C:5-2, N.J.S.A. 2C:20-4, N.J.S.A. 2C:21-25, N.J.S.A. 2C:21-9, and N.J.S.A. 2C:28-5 (count one); second-degree theft by deception, in violation of N.J.S.A. 2C:20-4, N.J.S.A. 2C:20-2(b)(4), and N.J.S.A. 2C:2-6 (count two); first-degree money laundering, in violation of N.J.S.A. 2C:21-25(b), N.J.S.A. 2C:21-8.1(b), and N.J.S.A. 2C:2-6 (count three); second-degree misconduct by a corporate official, in violation of N.J.S.A. 2C:21-9(c) and N.J.S.A. 2C:2-6 (count four); and second-degree witness tampering, in violation of N.J.S.A. 2C:28-5(a)(1), (2) and N.J.S.A. 2C:2-6 (count six). Fava was also charged individually with a separate count of second-degree witness tampering (count five).
Fava negotiated a plea agreement prior to defendant's jury trial, which took place between January 15 and February 21, 2008. At the close of the State's case, the court granted defendant's motion to dismiss the conspiracy to promote or facilitate the witness tampering charge in count one and the witness tampering charge in count six. The jury found defendant guilty of the remaining charges.
On June 6, 2008, the trial court denied defendant's motion for a judgment of acquittal on count three (first-degree money laundering) and a new trial on the other counts of the indictment. The court also denied the State's motion to sentence defendant to an extended term as a persistent offender. After merging count one with counts two, three, and four, the court imposed a seven-year prison term for second-degree theft by deception (count two); a consecutive fifteen-year term with five years of parole ineligibility for first-degree money laundering (count three); and a concurrent seven-year term for second-degree misconduct by a corporate official (count four). Thus, defendant's aggregate sentence is a twenty-two-year prison term with five years of parole ineligibility. Appropriate statutory penalties and assessments were also imposed, and defendant was ordered to pay restitution in the amount of $1,983,281.60. We affirm.
Defendant was a businessman who owned several New Jersey companies, including *350 Paterson Vending and Catering, Inc., trading as Tremont Bottling, Coffee Man, Inc. (Coffee Man), and VCS Rentals. His convictions resulted from his involvement with a wholesale produce company doing business as Packed Fresh Produce, Inc. (PFP), which he operated with co-defendant Fava and David Menadier in 1999 and 2000. Both Fava and Menadier testified for the State at defendant's trial.
By way of background, defendant was initially indicted for second-degree possession of stolen property (cigarettes) and second-degree conspiracy to receive stolen property in October 2001 (the cigarette case). The cigarettes were sold to defendant as part of an undercover sting operation. Because there was strong evidence of defendant's guilt in the cigarette case, his attorney arranged a series of meetings in an effort to negotiate a plea agreement.[1]
During those discussions, defendant agreed to provide information regarding other individuals involved in the cigarette case, and he offered to provide information about a case involving fraud in the produce industry. Prior to defendant's offer, Deputy Attorney General (DAG) William Gicking, who was prosecuting the cigarette case, was unaware of any on-going investigation regarding the produce industry. However, Gicking soon discovered that the Division of Criminal Justice (DCJ) had been investigating defendant's involvement with PFP for several months.
Two proffer sessions followed: the first on January 9, 2002, and the second on February 13, 2002. During these sessions, defendant was present with his attorney and the State was represented by Gicking, DAG William McGovern, Special Investigator (SI) David Nolan, and two other investigators. The primary purpose of both proffer sessions was to interview defendant regarding his knowledge and involvement in the produce case. The proffer sessions were not recorded or transcribed. Contemporaneous notes taken by Nolan were destroyed after he prepared memoranda in March 2003 summarizing the sessions.
On June 18, 2003, defendant pled guilty to third-degree receiving stolen property in the cigarette case. In exchange for the plea, the State agreed to recommend non-custodial probation. Defendant was subsequently sentenced in accordance with the plea agreement.
With regard to PFP, David Menadier pled guilty to first-degree money laundering and third-degree perjury on May 27, 2004, and Michael Fava pled guilty to first-degree money laundering and third-degree witness tampering on November 14, 2005. When Menadier entered his pleas, he admitted his involvement with PFP and acknowledged that it was "set up as a bust-out company." He also testified that defendant and Fava ran the business, and that Fava was responsible for ordering and selling the produce. Fava provided similar testimony when he entered his guilty pleas. Additionally, Menadier and Fava agreed to testify truthfully at defendant's trial.
The State established at trial that All Statewide Produce, Inc., trading as PFP, was incorporated in New Jersey on March 26, 1999. The certificate of incorporation identified Menadier as the corporation's president, director, and only shareholder. The company's address, "716 Newman Springs Road, Lincroft, N.J., Suite 312," was actually a mailbox that Menadier rented at Mail Boxes Etc.
In April 1999, Menadier signed a lease for warehouse space in Lodi, and he paid a security deposit in the amount of $1200 *351 with cash he received from defendant. On June 1, 1999, Menadier went to the North Brunswick office of the United States Department of Agriculture (USDA) and applied for a PACA[2] license on behalf of PFP. The license was issued on June 30, 1999.
On June 15, 1999, a person purporting to be Menadier phoned the Produce Reporter Company (PRC), which publishes the Blue Book, a standard reference source in the produce business. The caller provided information concerning PFP that was recorded on a business operations report and subsequently entered into PRC's database. In addition, PRC received financial statements for PFP, dated June 30, 1999, together with a report prepared by S & G Associates, CPA's, indicating that the statements were prepared "in accordance with standards established by the American Institute of Certified Public Accountants." [3] Based on this information, PRC gave PFP a favorable credit rating, which was published in the Blue Book in October 1999.
PFP began purchasing fresh fruits and vegetables from suppliers in late August or early September 1999. At first, PFP ordered relatively small quantities of produce and paid for it quickly. However, as its credit rating improved, the company ordered larger quantities. Payments for the larger orders were made more slowly, and several payment checks were returned for insufficient funds in December 1999 and January 2000. Consequently, the suppliers stopped selling produce to PFP in January 2000.
Complaints to the USDA resulted in a PACA investigation and the suspension of PFP's license in April 2000. Meanwhile, Menadier's attorney negotiated a settlement of a lawsuit brought by H.R. Bushman and Son (Bushman) that required PFP to pay $45,000 to satisfy a $85,279.35 debt. Menadier received $45,000 in cash from defendant in March 2000 to cover a certified check that Menadier paid to his attorney's trust account. Although the Bushman suit settled, discovery soon began in a separate PACA lawsuit brought by other produce companies. By March 2001, PFP was being investigated by the DCJ, the FBI, and the United States Postal Service.
Brian Onieal provided expert testimony for the State "in the area of financial fraud investigations." He explained that a planned bankruptcy, which is also known as a bust-out scheme, is a type of theft by deception in which a legitimate business is established "solely for the purpose of creating the business, operating the business, and then setting up the demise of [the] business in order to defraud the ... merchandise people that provide credit for that type of business." Onieal testified that a "nominee or front person" is typically involved in such schemes:
A nominee is a person ... who has a good credit rating ... [and] can be used as a person that is the business, is set up as a corporate owner or the president, CEO, et cetera. That person then would be responsible for the credit purchases, but at the time they're being *352 used by other people that are in the background that you can't see because their names aren't on anything.
Q. And what's ... the main purpose of having a nominee?
A. It's to continue the fraud, to establish the business, to get it into its operational phase, and then of course to close it out. And those other ... people that are involved in the scheme [are] ... not part of it now because ... the name of the owner is that nominee person who doesn't have anything to attach.
According to Onieal, there are usually six stages to a planned bankruptcy scheme: (1) a seemingly legitimate business is set up in accordance with normal industry standards; (2) the business seeks a favorable credit rating by paying its debts; (3) a good credit history is established as larger quantities of merchandise are ordered and paid for; (4) the business receives good credit references from trade sources; (5) the business purchases large amounts of merchandise on credit while paying creditors "a little bit at a time"; and, (6) in the final stage, the business sells as much merchandise as possible, sometimes at deep discounts, before declaring the company insolvent or threatening bankruptcy to avoid paying creditors.
Onieal testified cash is often used "as a tool" to continue the scheme because it is difficult to trace and because the intention is to "put [the cash] into your pocket ... and just walk away." When asked if "all the proceeds of a typical planned bankruptcy scheme end up in [a] bank account," Onieal testified:
No, they can't. That's part of the bust-out. You only want to put that amount of money into the account where you can keep your creditors at bay. You want to keep back the money that you want to take out of the business and put it in your pocket or get rid of it somehow. That's part of the money laundering operation.
In an effort to show how PFP's operations conformed with a typical bust-out scheme, the State presented testimony from produce suppliers and distributors who lost money as a result of their dealings with PFP. Christopher Tagami from Tanimura Distributing, Inc. (TDI), Carolyn Silva from Tanimura and Antle, Vincent Pupillo from H.R. Bushman, Brenda Gray and Louis Fishgold from Western Brokerage, Inc., and Bart Whitten from Tom Lange Company, all related similar experiences. In October 1999, PFP contacted them to initiate a business relationship. After checking the Blue Book, they allowed PFP to purchase produce on credit. Initially, PFP paid for the produce it received, but things began to fall apart in December 1999 when payments became erratic and phone calls to PFP went unanswered. All of the witnesses reported significant unpaid balances in their PFP accounts.
These same witnesses testified that the agreements to sell and ship produce were negotiated over the telephone and, in most cases, payment was required within thirty days. For example, Christopher Tagami, the sales manager for TDI, testified that PFP's credit limit was $300,000 because it initially paid in "30 days or less." Tagami also testified that TDI's last sale to PFP occurred on January 4, 2000.
Menadier testified he had known defendant for a couple of years before defendant approached him about starting a wholesale produce business. According to Menadier, defendant said he was going to be "the financial backer" and that Fava, who owned his own produce company, would handle purchasing and sales. Defendant made it clear that he and Fava would be silent partners and their names would not appear on any of the business documents. *353 Menadier had no experience in the produce industry and was never involved with the day-to-day operations of PFP. In July 1999, Menadier accepted a position as an assistant service manager at a car dealership in Ocean County, and he was a full-time employee at the dealership the entire time that PFP was in operation.
An attorney retained by Fava negotiated the H.R. Bushman settlement and also represented Menadier in the PACA lawsuit brought by other PFP creditors. Menadier testified that when he spoke to defendant about the PACA lawsuit, defendant told him "the lawyer [would] take care of it" and to "just keep your mouth shut." The lawsuit was ultimately settled with a civil consent judgment signed by Menadier's attorney. Menadier testified, however, that the judgment was entered without his knowledge or consent.
Fava testified he worked in the produce industry his entire life, and that he was in charge of buying and selling produce for PFP. According to Fava, the fruits and vegetables he ordered for PFP were mixed with the produce he purchased for his other businesses, Knowles Brokerage (Knowles) and M. Fava, Inc. (MFI). The combined produce was then sold to Fava's customers as if it had all come from Knowles or MFI, and the purchasers paid for the produce with checks made out to Knowles or MFI.
Fava confirmed that he frequently met with defendant to discuss PFP operations. At these meetings, Fava endorsed checks made out to Knowles or MFI and made them payable to Tremont Bottling or one of defendant's other companies. Defendant deposited the checks in his companies' accounts, but he withdrew enough cash from his accounts to cover PFP's expenses and deposited it into the PFP account.
To corroborate Fava's testimony, the State presented evidence of transactions in the business checking accounts of Tremont Bottling, Coffee Man, and VCS Rentals. James Blong, a financial investigator for the DCJ, testified that various checks made out to MFI and Knowles were deposited into the Tremont, Coffee Man, and VCS accounts, and some cash withdrawals from those accounts corresponded to cash deposits into PFP's account. According to Blong, there were eighty-one deposits into PFP's Bank of New York account between April 27, 1999 and January 18, 2000, totaling $748,516 "and every one was in cash." In addition, $6,639.81 was deposited into PFP's Fleet Bank account between January 19, 2000, and February 4, 2000. The Bank of New York account was closed on January 26, 2000, and the Fleet Bank account was closed on January 10, 2001.
The State also presented the testimony of Caroline Burrell, president of Continental Sales Company, who processed PFP's application for credit in December 1999. After learning that PFP had a very low balance in its checking account, Burrell decided to deny the credit application, and she telephoned a person she believed to be Menadier to advise him of the decision. The man with whom she spoke told her he had an investment account with "Joel Durel Investments" and provided her with "JD's" phone number. When Burrell called that number an individual, who identified himself as JD, assured her that PFP had a sizable investment account. Telephone records confirmed that the number given to Burrell for Joel Durel Investments belonged to a phone in defendant's office at Tremont Bottling.
Defendant did not testify in his own defense, but he presented testimony by Investigator Nolan, who acknowledged there were some leads in the case that were not followed. For example, Nolan *354 never spoke to the attorney who represented Menadier in the civil litigation. Defendant also presented testimony from William Horan, a former business associate of Fava, who described how Fava's double-dealing had ruined a produce company known as Superior Produce. Finally, defendant called an accounting expert, Ralph Evangelista, in an effort to show that there was no connection between Fava's checks and the cash deposits into the PFP accounts.
The State then recalled Blong to rebut Evangelista's testimony. According to Blong, the exhibits and financial information upon which Evangelista relied were consistent with Blong's original analysis and testimony regarding the source of the cash deposits into PFP's bank accounts.
The jury began deliberating on February 20, 2008, and returned its verdict the following day. On appeal, defendant presents the following arguments:
POINT I
BECAUSE COUNTS TWO, THREE AND FOUR OF THE INDICTMENT WERE TIME-BARRED BY THE FIVE-YEAR STATUTE OF LIMITATIONS, THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO DISMISS.
A. THE THEFT BY DECEPTION CHARGE IN COUNT TWO OF THE INDICTMENT REQUIRED DISMISSAL ON STATUTE OF LIMITATIONS GROUNDS.
B. THE MONEY LAUNDERING CHARGE IN COUNT THREE OF THE INDICTMENT REQUIRED DISMISSAL ON STATUTE OF LIMITATIONS GROUNDS.
C. THE MISCONDUCT BY A CORPORATE OFFICIAL CHARGE IN COUNT FOUR OF THE INDICTMENT REQUIRED DISMISSAL ON STATUTE OF LIMITATIONS GROUNDS.
D. THE TRIAL COURT'S REASONING IN SUPPORT OF ITS DECISION REPRESENTS CLEAR AND REVERSIBLE ERROR.
POINT II
DEFENDANT WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND HIS CONSTITUTIONAL RIGHT TO FUNDAMENTAL FAIRNESS WHEN THE STATE REFUSED TO HONOR THE TERMS OF HIS ORAL PLEA AGREEMENT. THE STATE MUST BE COMPELLED TO SPECIFICALLY PERFORM THE BARGAIN WHICH IT NEGOTIATED AND AGREED TO SO THAT THE DEFENDANT MAY GET THE BENEFIT OF HIS REASONABLE EXPECTATIONS.
A. THE AFFIDAVITS AND TESTIMONY OF [DEFENDANT AND HIS ATTORNEY] ESTABLISH CLEARLY AND CONVINCINGLY THAT THE STATE AND DEFENDANT HAD AGREED TO THE TERMS OF A NEGOTIATED PLEA PRIOR TO THE JANUARY 9, 2002 PROFFER SESSION.
B. IN FURTHERANCE OF THE ORAL PLEA AGREEMENT, AND IN DETRIMENTAL RELIANCE UPON ITS TERMS AND THE PROMISES OF THE PROSECUTOR, DEFENDANT WAIVED HIS CONSTITUTIONAL RIGHTS AND COOPERATED WITH THE STATE BY SUBMITTING TO TWO LENGTHY AND DETAILED PROFFER SESSIONS.
C. SPECIFIC PERFORMANCE OF THE ORAL PLEA AGREEMENT IS THE ONLY ADEQUATE *355 REMEDY AVAILABLE TO THE DEFENDANT.
D. THE TRIAL COURT'S REASONS IN SUPPORT OF ITS DECISION ARE UNTENABLE AND WITHOUT SUPPORT IN THE RECORD.
POINT III
THE TRIAL COURT ERRED IN NOT HOLDING A HEARING TO RECONSTRUCT THE PROFFER SESSIONS, SINCE THERE WAS NO TRANSCRIPT OR RELIABLE RECORD OF THOSE SESSIONS, WHICH RENDERED IMPOSSIBLE ANY ATTEMPT BY THE DEFENDANT TO CHALLENGE EVIDENCE INTRODUCED BY THE STATE AT TRIAL.
A. THE DEFENDANT'S PROFFER SESSION STATEMENTS SHOULD NOT HAVE BEEN USED AGAINST HIM AT EITHER THE GRAND JURY PROCEEDINGS OR TRIAL.
B. BECAUSE OF THE ABSENCE OF A RECORD OF THE STATEMENTS MADE BY THE DEFENDANT AT THE PROFFER SESSIONS, HE WAS ENTITLED TO A HEARING WITH TESTIMONY TO RECONSTRUCT THE RECORD.
C. IN DENYING THE DEFENDANT'S MOTION, THE TRIAL COURT'S REASONING WAS UNTENABLE AND WITHOUT SUPPORT IN THE RECORD OR APPLICABLE LAW.
POINT IV
THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A KASTIGAR-TYPE HEARING.
POINT V
BECAUSE THE JURY INSTRUCTIONS VIOLATED RULE 3:7-3 AND THE DEFENDANT'S RIGHTS OF PROCEDURAL DUE PROCESS, THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A NEW TRIAL.
POINT VI
THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S POST-TRIAL RULE 3:18-2 MOTION SEEKING AN ACQUITTAL OF COUNT THREE (MONEY LAUNDERING) OF THE INDICTMENT.
Based on our review of the record and the applicable law, we conclude that these arguments are without merit and require only the following discussion.
Defendant first argues that count two of the indictment (second-degree theft by deception) was barred by the statute of limitations because PFP received its last shipment of produce on January 12, 2000, more than five years prior to the February 1, 2005 indictment. Defendant concedes that deceptive conduct may have occurred within the statutory limitations period, but claims that such conduct is irrelevant because the deception must precede and induce the theft to be an element of the crime. We agree that deceptive practices are not an essential element of the theft by deception statute if they do not induce a victim to part with property, but we do not agree the indictment was untimely.
N.J.S.A. 2C:1-6(b)(1) requires the prosecution of certain crimes, including theft by deception, money laundering, and misconduct by a corporate official, to be commenced within five years after their commission. "An offense is committed either when every element occurs or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated." N.J.S.A. 2C:1-6(c). Moreover, if a series of thefts is committed pursuant to a *356 single scheme or a continuing course of conduct, the amounts involved may be aggregated, N.J.S.A. 2C:20-2(b)(4), and the statute of limitations runs "from the time of the last theft committed as part of the common scheme." State v. Jurcsek, 247 N.J.Super. 102, 110, 588 A.2d 875 (App. Div.), certif. denied, 126 N.J. 333, 598 A.2d 891 (1991); State v. Childs, 242 N.J.Super. 121, 134, 576 A.2d 42 (App.Div.), certif. denied, 127 N.J. 321, 604 A.2d 596 (1990).
In this case, the State established that fourteen companies were never paid for produce sold to PFP, and six of those companies, including TDI, sold produce to PFP in January 2000. Pursuant to industry practices and express credit agreements, PFP was required to pay for the produce within thirty days.[4] Under these circumstances, we reject defendant's statute of limitations argument because the last theft was not completed until sometime in February 2000, when PFP breached its contractual agreement to pay for the produce it purchased in January. See Ex parte Rosborough, 909 So.2d 772, 776 (Ala. 2004) (Nabers, C.J., dissenting) (stating that a theft by deception occurred within the statutory limitations period because the offense was not complete until the thief "ceased making the payments required under the [parties'] agreement").
Defendant also contends the money laundering charge (count three) and the misconduct by a corporate official charge (count four) are barred by the five-year statute of limitations. With regard to the money laundering charge, the trial court found the transactions in PFP's bank accounts after February 1, 2000, facilitated or promoted the bust-out scheme; and it found the $45,000 in cash that defendant paid to Menadier to settle a civil lawsuit in March 2000 was further evidence of money laundering occurring within the statute of limitations. The trial court also found there was "no doubt" that defendant continued to use PFP for an unlawful purpose subsequent to February 1, 2000. Those findings are fully supported by the record, and we agree that counts three and four of the indictment were not time-barred.
In his next point, defendant challenges the trial court's denial of his motion to enforce an oral plea agreement, which he claims was in place prior to the proffer sessions. In reply, the State contends that the matter was correctly decided because there was no plea agreement with regard to PFP.
Four witnesses testified during a two-day hearing in August 2007: defendant, his attorney, Gicking, and McGovern. Defendant testified that he wanted to put both cases "to sleep" and believed he "would get probation" so long as he cooperated. Additionally, defendant's attorney testified he had negotiated a plea agreement with Gicking and McGovern and that there was "a meeting of the minds." According to defendant's attorney, Gicking and McGovern both agreed that defendant "would receive probation" if he provided truthful information during the proffer sessions "about the cigarette case and the produce case."
Gicking testified there was no plea agreement prior to the proffer sessions, but there were discussions after the sessions regarding "some sort of global resolution" that would have disposed of both the cigarette case and the produce case. Based on those discussions, Gicking and McGovern spoke with their supervisors about a tentative plea agreement that would have resolved both cases. According to Gicking, his supervisor "had no problem disposing of the cigarette case," but McGovern's *357 supervisor thought "it was premature to offer a deal" in the produce case.
McGovern testified the first time he spoke to defendant's attorney was at the January 9, 2002 proffer session. At that time, defendant's attorney indicated that defendant wanted probation. However, McGovern explained he would not be in a position to discuss the ultimate disposition of the case until he heard "what the defendant had to say." McGovern also confirmed he made it clear to both defendant and his attorney he would need his supervisor's approval before a plea agreement could be finalized.
In reaching its decision, the court also considered the terms of the proffer agreements signed by defendant and his attorney prior to each of the sessions. Those agreements provided in pertinent part as follows:
Fourth, it is understood by your client that this meeting may ultimately result in a plea bargain. However, this agreement does not constitute a plea bargaining session. This meeting will determine whether there is a basis for a plea bargain to occur. If this agreement is subsequently construed as a plea bargaining session, your client knowingly and voluntarily waives any right your client has pursuant to N.J.R.E. 410.... It is further understood by your client that the agreement to provide information by way of a proffer is completely voluntary, without any promises or representations other than those set forth in this letter.
Fifth, your client understands and agrees that this agreement does not obligate the Division of Criminal Justice and the State of New Jersey to enter into any future plea bargaining with your client. In addition, your client understands that this office has not made, at any time, any additional promises to your client not contained in writing herein, and agrees that his decision to proffer information to the Division is completely voluntary, without any other promises or representations being made other than those set forth above.
Defendant and his attorney both signed the proffer agreements below a paragraph that read as follows:
I hereby acknowledge that this letter fully sets forth my agreement with the New Jersey Division of Criminal Justice. I understand the above-stated conditions and find them to be fair and reasonable. I state that there have been no additional promises or representations made to me, at any time, by officials or employees of the State of New Jersey or my prior or present attorney, in connection with this matter, and that I enter into this agreement knowingly and voluntarily. Since I wish to engage in the meeting as described above, my attorney and I have signed and acknowledged the agreement.
The court also reviewed a transcript of defendant's plea in the cigarette case, which occurred before Judge Joseph A. Falcone on June 18, 2003. When Judge Falcone asked defense counsel if there was anything he wished to place on the record, counsel stated:
Yes, judge, just briefly, Mr. Diorio is entering this plea today as a result of negotiations between myself and Mr. Gicking. And Mr. Diorio is aware that [there] is presently pending an investigation being conducted by the Attorney General's Office and potential federal authorities. I've advised him of that investigation. He's aware of it.
I've also advised him of the consequences of a plea in this case as to how it might affect any consequential issue that may arise if, in fact, he were ever *358 charged in that other investigation. I've advised him of the ups and downs, the pros and the cons. I tried to answer every question. He's aware of that investigation. And despite that, Your Honor, in light of the negotiations between Mr. Gicking and myself, he still chooses to proceed with this plea.
Prior to stating the factual basis for his plea, defendant answered several questions from the judge. Specifically, Judge Falcone explained the terms of the plea and then asked:
Is that the full plea bargain as you understand it?
MR. DIORIO: Yes, sir.
THE COURT: Has anybody made any other promises to you beyond what we've talked about?
MR. DIORIO: No, sir.
In addition, the plea form completed and signed by defendant and his attorney stated that no other promises or representations had been made by the prosecutor, defense counsel, or anyone else as a part of the plea agreement. In an oral decision on August 14, 2007, the trial court noted that "plea agreements are governed by contract law," and the court found that the plea discussions never resulted in an agreement because there was "no meeting of the minds":
In this case, the Court cannot find the presence of a plea agreement. There was no meeting of the minds. Although the defense contends that such an agreement was in place prior to the proffer sessions, that claim is directly refuted by the express terms of the proffer agreement.
Under the agreement, the proffer sessions were not considered plea bargaining sessions or plea bargains. Rather, the purpose of discussions was to determine whether there was a basis for a plea bargain to occur.
....
But what is perhaps [the] strongest evidence supporting the absence of a plea agreement is found in the defendant's June 18th, 2003 plea colloquy before Judge Falcone which occurred after all of these proffer sessions that we referred to. During the plea colloquy, the defendant was specifically asked whether anybody had made any other promises to him beyond those outlined in the plea papers.
The defendant answered in the negative. There is no mention of any promise or sentence leniency in exchange for cooperation. This Court is aware that cooperation is often kept confidential. However, with such [a] beneficial deal, this Court would expect even in the most generalized terms some mention of the agreement. Moreover, there is absolutely no reference to an over arching plea agreement encompassing both the cigarette case and the produce case.
If a global plea agreement was in place, in both cases as defense counsel argues, why does the record fail to mention it? This unanswered question allows only one conclusion. There was never a valid plea agreement with regard to the produce case at that time.
"Plea bargaining has become firmly institutionalized in this State as a legitimate, respectable and pragmatic tool in the efficient and fair administration of criminal justice." State v. Taylor, 80 N.J. 353, 360-61, 403 A.2d 889 (1979). A plea agreement affords a "mutuality of advantage" to both the defendant and the State. State v. Means, 191 N.J. 610, 618, 926 A.2d 328 (2007). "It requires a meeting of the minds upon the negotiated pleas and is an executory agreement since it depends on the approval of the sentencing court." State v. Smith, 306 N.J.Super. 370, 383, *359 703 A.2d 954 (App.Div.1997) (citing Mabry v. Johnson, 467 U.S. 504, 508-10, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437, 444 (1984)).
In this case, no plea agreement was ever committed to writing or presented to the court, and the clear language of the proffer agreements, executed by defendant and his counsel, expressly state that no plea bargain and no promises other than those stated in writing had been made. Moreover, Gicking and McGovern testified they told defendant and his attorney that any plea agreement had to be approved by supervisory personnel; and defendant confirmed that no additional promises were made to him when he entered his plea in the cigarette case. Under these circumstances, the trial court did not err in denying defendant's motion to enforce an oral plea agreement and in rejecting defendant's argument that he detrimentally relied on promises made by the State.
In his next point, defendant argues the court erred in denying his request for a hearing to reconstruct the proffer sessions. Defendant relies on the first paragraph of the proffer agreements to support his argument. However, the second paragraph is equally important. Those paragraphs read as follows:
First, except for paragraph two, three and four below, no statements made, or other information provided, by your client during the meeting will be used in a direct case against your client in any criminal proceeding in the State of New Jersey.
Second, the State may make derivative use, against your client or others, of any statements or other information provided by your client, and may pursue any investigative leads, against your client or others, suggested by any statements or other information provided by your client.[5]
During the hearing on defendant's motion to enforce a plea agreement, both defendant and his attorney provided testimony regarding the proffer sessions. Defendant's attorney testified that defendant "laid out his involvement in a conspiracy to commit a theft on a very large scale." When defendant testified, he said that he told the truth at the proffer sessions and that he "explained everything" because that was "the deal" his attorney negotiated. Defendant and his attorney also confirmed that Nolan took notes constantly throughout the sessions.
In an affidavit in opposition to defendant's motion, Nolan stated that the PFP case first came to the DCJ's attention in February 2000, when it received a complaint from one of the victim companies. An investigation was initiated in April 2000, at which time Menadier was identified as president of PFP. Nolan followed leads in the spring and summer of 2000 that uncovered PFP's Blue Book information, the PACA license application, the Lodi warehouse, the civil lawsuit, Menadier's deposition, the Mail Boxes Etc. lease, and records from PFP's account at the Bank of New York.
Nolan further stated that in June 2001, the woman who made the cash rental payments for the PFP warehouse in Lodi identified defendant as the person providing the money for the payments. In June and July 2001, Nolan searched various data bases for information concerning defendant and his companies; and in August 2001, Menadier's former girlfriend informed Nolan that Menadier and defendant had been partners in PFP, *360 with defendant acting as a silent partner and financial backer. In October 2001, Nolan learned that "Fava had ordered and paid for inspections" on some of the produce PFP ordered, and Nolan obtained documents from PACA regarding Fava's produce companies. In addition, Nolan confirmed that Menadier, Fava, and defendant were identified "as the primary suspects" in the PFP bust-out scheme by the time of the first proffer session in January 2002.
In his affidavit, Nolan also described what occurred at the proffer sessions. He explained that defendant admitted introducing Menadier to Fava, but defendant "denied any involvement in the scheme." Defendant also admitted making cash rental payments and cashing checks for Fava but denied doing so as a participant in the bust-out scheme. Because defendant minimized his conduct during the proffer sessions, the State proceeded with its investigation, focusing its efforts on Menadier, who eventually entered a plea and agreed to cooperate. A lengthy statement obtained from Menadier on May 27, 2004, provided the basis for the State to move forward in its case against Fava and defendant.
After reviewing a transcript of the grand jury proceedings on February 1, 2005, Nolan's affidavit, and other documents submitted by the parties, the court determined that "the State had obtained the information used to secure [defendant's] indictment from a wholly independent source other than the defendant himself and the information he provided during the proffer sessions." In addition, the court stated that it would "deal with" any attempt by the State "to use information in violation of the agreement" at the time of trial. Therefore, the court concluded there was no need for a hearing to reconstruct what was said at the proffer sessions.
Our scope of review of the trial court's determination that the State's evidence was independent of information revealed by defendant at the proffer sessions is limited. State v. Barone, 147 N.J. 599, 615, 689 A.2d 132 (1997). "The test is `whether the findings made [by the trial court] could reasonably have been reached on sufficient credible evidence present.'" Ibid. (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)).
In this case, the clear terms of the proffer agreements prohibited the State from using proffer information in its direct case, but the State was permitted to make derivative use of defendant's statements and to "pursue any investigative leads ... suggested by any statements or other information" defendant provided. Although defendant now claims the denial of his motion to reconstruct the proffer sessions was reversible error, he never objected to any proposed testimony or evidence presented at trial on the grounds that it violated the proffer agreements, and he does not cite to any specific instance when the State used any proffer information on its case-in-chief, cross-examination, or rebuttal. Moreover, we conclude from our review of the record there was sufficient credible evidence to support the trial court's decision, and the trial court did not err in denying defendant's motion to reconstruct the proffer sessions.
Defendant's remaining arguments are clearly without merit and only require brief discussion. R. 2:11-3(e)(2). In Point IV, defendant contends the trial court should have held "a Kastigar-type[6] hearing." At a Kastigar hearing, the State "has the burden of establishing that its *361 evidence is not tainted by information derived from immunized testimony." State v. Irizarry, 271 N.J.Super. 577, 586, 639 A.2d 305 (App.Div.1994) (emphasis added). A Kastigar hearing may be necessary when a defendant is compelled to provide incriminating testimony in contravention of the Fifth Amendment right against self-incrimination. But that did not happen here. Because defendant was not compelled to participate in the proffer sessions, there was no infringement of his Fifth Amendment privilege and no need for a Kastigar hearing.
In Point V, defendant contends the trial court erred in denying his motion for a new trial. And in Point VI, he claims the court erred in denying his motion for a judgment of acquittal on the first-degree money laundering charge (count three). Judge Francis P. DeStefano explained his reasons for rejecting both motions in a comprehensive written decision, and his findings and conclusions are fully supported by the record. We therefore affirm the order entered on June 6, 2008, substantially for the reasons he stated.
The judgment of conviction is affirmed.
NOTES
[1] Defendant has been represented at various times by at least five different attorneys.
[2] Under the Perishable Agricultural Commodities Act, 7 U.S.C.A. §§ 499a-s, all entities within the marketing chain for fresh produce must be licensed by the USDA. 7 U.S.C.A. § 499c.
[3] The parties stipulated that a search of the records of the New Jersey State Board of Accountancy revealed there was no record "that a CPA firm named S & G Associates, CPA's, is or ever was a registered CPA firm of the Board of Accountancy." In addition, the address on the report by S & G Associates, CPA's, was Menadier's home address in Red Bank.
[4] The Blue Book assigns an "F" rating to any company that fails to pay within sixty days.
[5] The third paragraph of the proffer agreements, which allowed the State to use defendant's statements on cross-examination or as rebuttal evidence, is not relevant because defendant did not testify at trial and the State did not use his statements in rebuttal.
[6] Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).