SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Joseph Diorio** **(A-110-11) (069597)**

**Argued May 13, 2013 -- Decided February 12, 2014**

**CUFF, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, the Court considers whether the State brought indictments for money laundering and theft by deception prior to expiration of the five-year statute of limitations and determines whether the two offenses are continuing offenses.

In March 1999, defendant Joseph Diorio started a wholesale produce company with David Menadier and Michael Fava. Menadier, who had no prior experience in the industry, was listed as the company's president, director and sole shareholder. Diorio and Menadier formed a C-corporation, trading as Packed Fresh Produce, Inc. (PFP), opened a bank account, and obtained the required license from the USDA. Diorio provided start-up funds from his personal business accounts. In June 1999, Diorio or Fava contacted the Produce Reporting Company (PRC), which issues the Blue Book, a directory of produce companies and their credit ratings, and told it that PFP possessed financial assets almost $100,000 higher than its actual assets. Based in part on this information, the October 1999 Blue Book listed PFP with a favorable rating. In accordance with customary industry practice, PFP then began ordering small amounts of produce from various suppliers on credit.

Although Diorio and Fava mixed PFP's operations and finances with their separate businesses, PFP initially made prompt payments and paid over the average price for produce, thereby quickly improving its credit rating and reputation. As companies increased their credit line with PFP, it increased the cost and volume of its orders. PFP then began to miss payments and write bad checks. On January 12, 2000, PFP placed its last order, and its bank account was closed in January 2000 due to uncollected funds. Diorio and Menadier opened a new account at another bank and made deposits until February 4, 2001. Around that time, PFP entered into settlement negotiations with several creditors. In March 2000, Diorio gave Menadier $45,000 to satisfy one of the debts. On March 17, Menadier deposited the cash in his personal checking account and obtained a cashier's check for the settlement payment. By April 2000, the USDA had suspended PFP's license for failure to pay its suppliers, and several creditors had filed a civil suit in federal district court.

On February 1, 2005, a Monmouth County Grand Jury returned an indictment charging Diorio and Fava with numerous crimes. Diorio moved to dismiss the indictment, arguing that several of the charges, including second-degree theft by deception and first-degree money laundering, were barred by the statute of limitations. N.J.S.A. 2C:1-6(c). Relying in part on the fact that N.J.S.A. 2C:20-2(b)(4) expressly authorizes the aggregation of separate losses to grade the offense, the trial court determined that theft by deception may be classified as a continuing offense when multiple acts of theft are part of a common scheme. The court also concluded that money laundering is a continuing offense, noting that N.J.S.A. 2C:21-27 also permits aggregation. It determined that PFP's final act of business occurred when funds derived from the scheme were used in the March 2000 settlement. Diorio was found guilty and sentenced to a seven-year prison term for theft by deception and a consecutive fifteen-year term for money laundering, with a five-year period of parole ineligibility.

Diorio appealed, arguing that his prosecution for theft by deception was barred because the five-year limitations period on the theft by deception charge commenced on January 12, 2000. He also contended that the trial court erroneously relied on transactions that do not constitute money laundering. In a published opinion, State v. Diorio, 422 N.J. Super. 445 (App. Div. 2011), the Appellate Division affirmed the conviction, concluding that the last theft was not completed until sometime in February 2000, when PFP breached its contractual agreement to pay for the produce it purchased in January. The panel also determined that the post-February 1, 2000, transactions involving PFP's bank accounts were part of the overall money laundering scheme and that the settlement money was evidence of it. The Court granted certification. 210 N.J. 217 (2012).

1

**HELD:** For purposes of the statute of limitations, when a defendant engages in a scheme to obtain the property of another by deception, theft by deception is a continuing offense. If the scheme involves the promise to pay at a later

date, the limitations period does not commence until the day after payment is due. Money laundering is a continuous offense only when there is evidence of successive acts that facilitate the common scheme to defraud. Applying these principles here, the statute of limitations on the theft by deception charge expired prior to return of the indictment, thereby barring Diorio's prosecution for that offense. In contrast, the money laundering charge was timely since the relevant transactions occurred within five years before the indictment was filed.

1. The criminal statute of limitations, which is an absolute bar to prosecution, balances the right of the public to have those who commit crimes charged, tried and sanctioned with the right of the defendant to a prompt prosecution. With certain exceptions, prosecution for an offense must commence within five years after commission. N.J.S.A. 2C:1-6(b)(1). An offense is committed once every element of the crime occurs or when the criminal course of conduct ceases, and the limitations time period commences on the day after commission of the offense. N.J.S.A. 2C:1-6(c). (pp. 18-19)

2. Continuing offenses involve conduct spanning an extended period of time and generating harm that continues uninterrupted until the course of conduct ceases. Unless the Legislature explicitly declares an offense continuous, there is a presumption against it. However, when an offense involves a common scheme of ongoing conduct and, under the relevant statute, the amounts involved can be aggregated to form a single offense, the Legislature generally considers the offense continuous. (pp. 19-23)

3. Although the theft by deception statute permits aggregation to determine the grade of the offense, the Legislature has not expressly declared theft by deception a continuing offense. Nevertheless, it has been found to be a continuing offense when the defendant is engaged in a scheme to obtain funds by deception. Here, Diorio implemented a scheme that was dependent on a series of actions designed to create the impression that PFP was a legitimate business. When, like Diorio, a defendant engages in a scheme to obtain the property of another by deception, that conduct is a continuous offense for purposes of the statute of limitations. Although a majority of jurisdictions have held that the statute of limitations for comparable theft offenses begins to run at the time of the receipt of property, when the scheme involves the purchase and delivery of a product followed by payment at a later date, the last act of theft by deception occurred when the obligation to pay was breached. Thus, the limitations period begins to run on the day following the date payment is due. (pp. 23-32)

4. The offense of money laundering involves an underlying criminal activity that generates property which is then either used to facilitate criminal activity or is "washed." As with theft by deception, the amounts involved in money laundering transactions conducted pursuant to one scheme may be aggregated to determine the degree of the offense. Federal law is split on whether money laundering is a continuing offense, but the broad scope of the New Jersey statute, N.J.S.A. 2C:21-25, supports the conclusion that money laundering is a continuous offense only when the record contains evidence of successive acts that facilitate and promote a common scheme to defraud. (pp. 32-37)

5. With respect to the question of whether the indictment against Diorio was filed within five years of commission of the last element of each offense, the Court agrees with the Appellate Division that the last act of theft occurred when PFP breached its contractual agreement to pay. Since there was no evidence establishing payment terms for the produce shipped on January 12, 2000, the Court assumes that, in accordance with federal regulations, payment was due ten days after receipt and acceptance. Allowing five days for transit, payment was due on January 27, 2000, rendering that the date of the last constituent theft. The limitations period began to run on January 28 and expired before the indictment was returned on February 1, 2005. Therefore, Diorio's prosecution for theft by deception is barred. As for the money laundering offense, the evidence reveals an on-going scheme to defraud creditors and hide the proceeds. The Court concludes that the $45,000 cash transaction in March 2000 between Diorio and Menadier facilitated that criminal activity because it enabled Diorio to retain a portion of the profits from the scheme. Since the transaction occurred within five years before the indictment was filed, the money laundering charge was timely. (pp. 37-42)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUDGE CUFF's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

JOSEPH DIORIO,

    Defendant-Appellant.


        Argued May 13, 2013 – Decided February 12, 2014

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 422 N.J. Super. 455 (2011).

        Anil K. Arora argued the cause for appellant
        (Mr. Arora, attorney; Mr. Arora and Jeffrey
        M. Zajac, on the briefs).

        Frank J. Ducoat argued the cause for
        respondent (Jeffrey S. Chiesa, Attorney
        General of New Jersey, attorney).

    JUDGE CUFF (temporarily assigned) delivered the opinion of

the Court.

    In 1999, Joseph Diorio and two others conceived and

executed a "bust-out" financial scheme by creating a business

for the purpose of defrauding creditors. In a bust-out scheme,

a company is formed and establishes a credit line presenting

itself to the business community as a reputable company.

Initially, it places small orders with suppliers. As it

establishes a favorable payment history, the company's credit

limit is increased.  Once the company's suppliers are satisfied that the company has established a reputation for prompt payment, the volume of orders increases in size and cost.  Once the goods are received, the company sells them but does not pay the supplier.  The company stalls suppliers as long as possible before it declares bankruptcy or simply disappears, leaving suppliers unpaid.

Diorio and two others formed a corporation to distribute fresh produce.  Defendant leased warehouse space with no refrigeration, obtained a license from the United States Department of Agriculture (USDA), and submitted information to obtain a credit rating.  Then the business placed its first orders.  Consistent with the basic parameters of a bust-out scheme, small orders were placed for fresh produce, and payment was made promptly.  Once the business established its reliability with suppliers, the size of the orders increased, and payments to suppliers slowed and then stopped altogether. Meanwhile, every shipment of produce immediately left the company's warehouse and was transported to one of the warehouses operated by defendant and a co-defendant, who commingled the produce with their stock and sold it to their customers.

The scheme organized and implemented by defendant placed its first order in late August 1999 and its last order in mid-January 2000.  An indictment was returned on February 1, 2005.

The statute of limitations for the charged offenses is five years.

This appeal concerns whether the State returned the indictment on the money laundering and theft by deception charges before expiration of the five-year statute of limitations. Central to this issue is whether these offenses are continuing offenses because the statute of limitations on such an offense does not begin to run until the prohibited conduct ceases. We must also determine whether the limitations period for the theft by deception charge runs from receipt and acceptance of the last shipment of goods or the date on which payment was due.

We hold that both offenses are continuing offenses. We also hold that when property has been obtained by a deceptive transaction that includes the extension of credit, the crime of theft by deception is not complete until payment has not been made in accordance with the agreement. Here, payment for the final shipment was not made in accordance with the purchase agreement, more than five years before return of the indictment, thus barring the indictment for theft by deception. We, therefore, affirm in part and reverse in part the judgment of the Appellate Division.

I.

3

Defendant Joseph Diorio owned several food industry companies in New Jersey, including Paterson Vending and Catering, Inc. and Victorian Coffee Systems. In March 1999, defendant approached a friend, David Menadier, and a business acquaintance, Michael Fava, about starting a wholesale produce company. Although Menadier had no prior experience in the produce industry, defendant proposed that Menadier be listed as the company's president, director and sole shareholder because defendant had previously sold a produce company and was bound by a non-compete provision. Defendant proposed that Fava would be a silent partner responsible for brokerage of the produce because Fava had over thirty years of experience in the produce industry and owned two produce companies, Knowles Brokerage Inc. (KBI) and M. Fava, Inc. (M. Fava). Defendant informed Menadier and Fava that he would act as a "silent partner" and a "financial backer." Menadier and Fava agreed to defendant's business proposal and the three began to take steps to establish the produce business.

Using the proceeds from defendant's other business bank accounts, defendant provided funds to Menadier to incorporate the produce company. In April 1999, defendant selected a non-refrigerated warehouse in Lodi to receive produce and instructed Menadier to sign a one-year lease. Defendant also advised and assisted Menadier in taking other steps to establish a wholesale

4

produce business, such as forming a C-corporation with the State of New Jersey under the name All Statewide Produce, Inc., trading as Packed Fresh Produce, Inc. (PFP), obtaining a Perishable Agricultural Commodities Act (PACA) license, as required by 7 U.S.C.A. § 499c, from the USDA, and opening a mailbox account and a PFP business bank account.  Menadier also changed the address on his driver's license to match the mailbox address.

In June 1999, a person representing himself as Menadier contacted the Produce Reporting Company (PRC), which issues the Blue Book, a directory and reference guide on produce companies and their credit ratings.  The Blue Book is a vital publication in the produce industry, so much so that it is referred to as "the Bible" by industry insiders.  Either Fava or defendant, posing as Menadier, repeatedly provided PRC false information about PFP's operations and finances, including that PFP operated a refrigerated warehouse, sold approximately 250 truckloads of produce per year to chain stores and to other wholesale markets, and possessed financial assets nearly $100,000 higher than its actual assets.  Defendant also submitted fabricated financial statements to PRC, purportedly prepared by an accounting firm. Based upon this false information, the October 1999 edition of the Blue Book listed PFP with a favorable credit rating.

5

Supported by a favorable Blue Book credit rating, PFP began to order small amounts of produce from various suppliers on credit, as is customary for wholesalers in the produce industry. From the inception of PFP, the corporation's operations and finances were commingled with Fava's and defendant's separate businesses. Fava mixed PFP's produce with produce from his family produce companies, sold the produce as a product of his family companies and received checks payable to his family companies in payment for the commingled produce. Fava endorsed some of these checks to be made payable to defendant's separate businesses. Defendant then deposited the checks into his separate company accounts and withdrew some of the cash to be deposited into PFP's bank account.

Due to its initial prompt payments and willingness to pay more than the average price of produce, PFP quickly improved its credit rating and gained a favorable reputation in the produce industry. As companies increased their credit line with PFP, it dramatically increased the total cost and volume of its orders. Almost immediately after its credit line increased, PFP began to miss payments to its suppliers and wrote several checks that were returned for insufficient funds.

By January 2000, six suppliers were still shipping produce to PFP. Representatives of two of the suppliers, Tanimura & Antle, Inc. (Tanimura & Antle) and Tanimura Distributing

6

(Tanimura), testified at trial. Carolyn Silva, the credit manager for Tanimura & Antle, testified that she imposed a payment term of ten days when she first authorized credit in October 1999. Initially, PFP paid within fifteen days. In December 1999, PFP increased the number and volume of its orders significantly and Silva began to notice slower and slower payments. Silva testified that PFP payments were "kind of sliding to 20 or 22 days." She also received checks that were returned for insufficient funds. The last shipment from Tanimura & Antle to PFP was on January 5. The payment term, however, remained ten days from receipt of the produce. The invoice for the January shipment provided that payment was due from PFP ten days after receipt of the produce. Allowing five days for shipment, payment was due on or before January 20, 2000. PFP did not pay this invoice and Tanimura & Antle rebuffed PFP's further orders. At that time, PFP owed Tanimura and Antle $496,818.60 for produce shipped to it.

Christopher Tagami, a sales manager for Tanimura, testified that his company sold produce to PFP between October 1999 and January 4, 2000. For the first month that Tanimura did business with PFP, the payment term was thirty days. PFP met this term and started to increase the number and volume of orders. When payment slowed, Tagami reduced the payment period from thirty days to fourteen days from the date of receipt of the produce.

7

The last invoice to PFP from Tanimura was dated January 4, 2000, but Tagami testified that payment was due on January 18, 2000 because the product had shipped before the date of the invoice. PFP did not pay this invoice, Tanimura placed a hold on its account, and the company rebuffed further attempts by PFP to order produce.

An exhibit marked in evidence, S-4, lists two orders from PFP on January 11, 2000, and January 12, 2000, to Andrew Smith Company and Pacific Gold Farms, Inc., respectively.[1] According to industry norms, payment was due within ten days of receipt, 7 C.F.R. § 46.2(aa)(5). Allowing for five days for delivery, payment was due to Andrew Smith Company on or before January 26, 2000, and to Pacific Gold Farms on or before January 27, 2000.

The spring 2000 issue of the Blue Book gave PFP the lowest possible credit rating. Additionally, PFP's business account with the Bank of New York was closed in January 2000 due to uncollected funds. Defendant and Menadier immediately opened a new PFP business account at Fleet Bank, which named Menadier as the corporate president. Menadier transferred funds from the Bank of New York account and made deposits into the Fleet Bank account until February 4, 2001.

---

[1] Fava testified that a cash deposit into the PFP business account occurred on January 18, 2000, and PFP ordered produce after that date. He was unable to identify any order after that date. Exhibit S-4, which lists PFP suppliers and dates of orders, reveals no order after January 12, 2000.

8

Fava, who pled guilty to one count of money laundering and one count of witness tampering, explained the disposition of the produce ordered by PFP and of the proceeds from the sale of PFP produce. He dispatched one of his employees to run the Lodi warehouse and transferred a forklift from either M. Fava or KBI, the two produce companies with which he was involved. On delivery to the Lodi warehouse, PFP produce was commingled with shipments of produce from M. Fava or KBI to their customers. When the M. Fava or KBI customers paid, Fava deposited the checks in the M. Fava or KBI accounts or sent checks to defendant. Some of the checks sent to defendant were endorsed by him to a company owned and operated by him. Occasionally, Fava performed a rough estimate of the amount of PFP produce sold to his customers through M. Fava or KBI, withdrew enough cash from those accounts to pay some PFP expenses, and deposited cash in the PFP business account. Fava further testified that defendant also made cash deposits into the PFP business account. The last deposit of cash into the PFP business account occurred on January 18, 2000, although M. Fava or KBI received at least one payment from a customer in early March 2000.

As payments to the suppliers slowed or stopped, suppliers filed suit to collect the sums due. PFP, represented by Fava's attorney, entered into negotiations to settle its debts with several creditors. Of particular relevance to this appeal is a

debt settlement with creditor H.R. Bushman and Son (Bushman), in which defendant gave Menadier $45,000 in cash to satisfy an $85,279.35 debt. On March 17, 2000, Menadier deposited the cash into his personal checking account, obtained a cashier's check for the same amount payable to the attorney's trust account, and gave the check to the attorney.

The USDA began investigating reparation complaints against PFP and, by April 2000, suspended PFP's PACA license for failure to pay its produce suppliers. In addition, several of PFP's creditors filed a civil suit against PFP in federal district court in New Jersey, seeking a preliminary injunction to freeze PFP's assets and claiming a loss of $1,701,438.80 among fourteen creditors. See Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc., 222 F.3d 132, 140-41 (3d Cir. 2000) (directing entry of preliminary injunction to halt dissipation of trust assets).

In response to one of the pending civil actions, Fava fabricated a corporate ledger of invoices, packing slips, and credit balances, and both defendant and Fava prepared Menadier for depositions. Defendant and Fava aggressively instructed Menadier to keep their names out of the litigation. Accordingly, Menadier made untruthful statements at depositions in July 2000 and November 2001. In January 2001, Menadier, representing PFP, entered into a civil consent judgment for $1.7

million with Menadier assuming personal responsibility for half of the judgment amount.

II.

Following an investigation by several federal agencies, including the Federal Bureau of Investigation and the United States Postal Inspection Service, Menadier entered a plea of guilty to money laundering and perjury.  Then, on February 1, 2005, a Monmouth County Grand Jury returned a six-count indictment charging defendant and co-defendant Fava with first-degree conspiracy to promote or facilitate the crimes of theft by deception, money laundering, misconduct by a corporate official, and witness tampering, N.J.S.A. 2C:5-2, N.J.S.A. 2C:20-4, N.J.S.A. 2C:21-25, N.J.S.A. 2C:21-9, and N.J.S.A. 2C:28-5 (count one); second-degree theft by deception, N.J.S.A. 2C:20-1, N.J.S.A. 2C:20-2b(4), and N.J.S.A. 2C:2-6 (count two); first-degree money laundering, N.J.S.A. 2C:21-25b, N.J.S.A. 2C:21-8.1b, and N.J.S.A. 2C:2-6 (count three); second-degree misconduct by a corporate official, N.J.S.A. 2C:21-9c and N.J.S.A. 2C:2-6 (count four); and second-degree witness tampering, N.J.S.A. 2C:28-5a(1) and N.J.S.A. 2C:2-6 (count six).[2] Menadier was not named in the indictment as a co-conspirator.

After the indictment, Fava pled guilty to first-degree money laundering and third-degree witness tampering.  Both

_____

[2] Only Fava was charged in count five with witness tampering.

11

Menadier and Fava agreed to testify at defendant's trial, which occurred between January 15 and February 21, 2008.

Following the return of the indictment and the entry of a guilty plea by co-defendant Fava, defendant filed a motion to dismiss the indictment. Defendant argued that the conspiracy, theft by deception, money laundering, and misconduct by a corporate official charges were barred by the statute of limitations. The trial judge held that the indictment had been returned within the five-year limitations period imposed by N.J.S.A. 2C:1-6c. The judge concluded that theft by deception may be classified as a continuing offense when multiple acts of theft are part of a common scheme. Furthermore, the trial court reasoned that N.J.S.A. 2C:20-2b(4) supported classification of theft by deception as a continuing offense by expressly authorizing the aggregation of the separate losses to grade the offense. Finally, the trial judge determined that the scheme commenced in summer 1999 and continued through spring 2000 as defendants made several attempts to disguise their fraudulent activities.

Addressing the money laundering charge, the trial judge also concluded that the offense should be considered a continuing offense. Once again, he relied on the statutory authority to aggregate the amounts of separate transactions to determine the grade of the offense, see N.J.S.A. 2C:21-27. The

trial judge also determined that the business operations of PFP continued after receipt of the last produce shipment on January 12, 2000.  The trial judge specifically identified the use of funds derived from the scheme in March 2000 to fund the settlement of a civil action filed against PFP.

Defendant renewed this motion at the close of the State's case.  The trial court denied the motion.[3]  The jury found defendant guilty of the remaining charges.  On June 6, 2008, the trial court denied defendant's motion for a judgment of acquittal on count three (first-degree money laundering) and a new trial on the remaining counts of the indictment.  The trial court also denied the State's motion to sentence defendant to an extended term as a persistent offender.  The trial court merged count one with counts two, three, and four, and imposed a seven-year prison term for second-degree theft by deception (count two); a consecutive fifteen-year term with five years of parole ineligibility for first-degree money laundering (count three); and a concurrent seven-year term for second-degree misconduct by a corporate official (count four).  Appropriate statutory penalties and assessments were also imposed, and defendant was ordered to pay restitution in the amount of $1,983,281.60.

III.

---

[3] The trial court granted defendant's motion to dismiss the conspiracy to promote or facilitate the witness tampering charge in count one and the witness tampering charge in count six.

Defendant appealed to the Appellate Division. He argued that the theft by deception charge was barred by the five-year statute of limitations because PFP received the last shipment of produce on January 12, 2000, more than five years prior to the February 1, 2005 indictment. Defendant further argued that the money laundering charge was barred by the five-year statute of limitations because the court improperly relied on transactions that do not constitute money laundering.[4]

In a published opinion, the Appellate Division affirmed defendant's conviction. State v. Diorio, 422 N.J. Super. 445 (App. Div. 2011). The appellate panel rejected defendant's argument that the theft by deception charge was barred by the statute of limitations. Id. at 458-59. The panel relied on the dissent in Ex parte Rosborough, 909 So. 2d 772, 776 (Ala. 2004) (Nabers, C.J., dissenting) and determined that the last theft was not completed until sometime in February 2000, when PFP breached its contractual agreement to pay for the produce it

---

[4] Defendant also maintained that the State refused to honor his oral plea agreement, thereby violating his right to due process. Defendant also contended the trial court erred in not holding a hearing to reconstruct the proffer sessions, the trial court erred in denying his motion for a new trial because the jury instructions violated Rule 3:7-2, and that the trial court erred in denying his motion for an acquittal on the money laundering charge. The panel determined that no plea agreement was entered into in this case, sufficient credible evidence supported the trial court's decision to deny the motion to reconstruct the proffer sessions, and that defendant's remaining arguments were without merit. This appeal is limited to whether the indictment was returned within the statute of limitations.

14

purchased in January.  Diorio, supra, 422 N.J. Super. at 458-59.
The panel also rejected defendant's argument that the money
laundering charge was barred by the five-year statute of
limitations, finding that the transactions in PFP's bank
accounts after February 1, 2000, facilitated or promoted the
bust-out scheme; and further that the $45,000 in cash that
defendant paid to Menadier to settle the Bushman lawsuit in
March 2000 was evidence of money laundering occurring within the
statute of limitations.  Id. at 459.  This Court granted
defendant's petition for certification.  210 N.J. 217 (2012).

IV.

A.

Defendant contends that a finding by this Court that theft
by deception, N.J.S.A. 2C:20-4, is a continuing offense "would
do violence" to the legislative purposes behind the statute.
Applying the two-part test identified in Toussie v. United
States, 397 U.S. 112, 115, 90 S. Ct. 858, 860, 25 L. Ed. 2d 156,
161 (1970) to identify a continuing offense, defendant argues
that the offense does not qualify as a continuing offense
because the Legislature has not expressly stated that theft by
deception is a continuing offense and the nature of the offense
focuses on single acts rather than a scheme.

Defendant further argues that, if this Court were to hold
that the continuing offense doctrine applies, the statute of

15

limitations began to run as of January 12, 2000, when PFP received the last shipment of produce, and receipt of the produce was the last act constituting a theft. According to defendant, any deceptive act after January 12, 2000, is irrelevant because PFP did not obtain any further property after this date.

Defendant next contends that money laundering is not a continuing offense because neither the language, meaning, nor legislative history of N.J.S.A. 2C:21-25 reveals it to be a continuing offense, and nothing inherent in the statute itself makes the conduct continuing in nature. Defendant asserts that a deposit made by Menadier in March 2000 into his personal bank account represents money that had been illegally acquired months earlier and does not extend the statute of limitations. Defendant further argues that this deposit does not constitute an act of money laundering because it did not involve a deposit into a PFP bank account.

## B.

The State responds that the language of the theft by deception statute, N.J.S.A. 2C:20-4, manifests a legislative intent to prohibit continuing conduct because two elements of the crime, deception and exercise of control over property of another, involve conduct that can extend beyond isolated events. The State emphasizes that the authority to aggregate the amounts

16

obtained from separate thefts provides further evidence of legislative intent.

The State next argues that if this Court holds that N.J.S.A. 2C:20-4 is a continuing offense, the indictment was timely filed.  The State asserts that defendant's deceptive course of conduct continued until January 2001, almost four years before the return of the indictment.  The State refers to the transfer of funds for two debt settlements:  (1) the $45,000 cash transfer from defendant to Menadier's personal bank account in March 2000 for the Bushman settlement; and (2) a January 2001 cashier's check to a law firm as part of a separate debt settlement.  The State also asserts that the Appellate Division correctly determined the last theft was not completed until sometime in February 2000 when PFP breached its contractual agreement to pay for the produce it purchased in January.

As to the money laundering offense, the State contends that given the broad reach of the statute, N.J.S.A. 2C:21-25b(1), as well as the ability to aggregate the amounts involved in the transactions conducted pursuant to a scheme or course of conduct, a legislative purpose exists to prohibit a continuing course of conduct.  The State asserts that two money laundering transactions occurred within the five-year statute of limitations period.  The State highlights the March 17, 2000 deposit of $45,000 in Menadier's personal account for the

17

Bushman settlement and the February 4, 2000 deposit of $5,639.81 into PFP's Fleet Bank account which was later transferred to an attorney trust account to settle other PFP debts.

V.

A criminal statute of limitations is designed to protect individuals from charges when the basic facts have become obscured by time. Toussie, supra, 397 U.S. at 114-15, 90 S. Ct. at 858, 25 L. Ed. 2d at 161; State v. Zarinsky, 75 N.J. 101, 106 (1977). A statute of limitations balances the right of the public to have persons who commit criminal offenses charged, tried and sanctioned with the right of the defendant to a prompt prosecution. Zarinsky, supra, 75 N.J. at 106-07.

The Legislature has determined that some offenses are so heinous and the effect on society so severe that the offender may be charged at any time. To that end, the Legislature has declared that prosecution for murder, N.J.S.A. 2C:11-3; manslaughter, N.J.S.A. 2C:11-4; and sexual assault, N.J.S.A. 2C:38-1 to -5, may be commenced at any time. Except for bribery, N.J.S.A. 2C:27-2; compounding, N.J.S.A. 2C:29-4; official misconduct, N.J.S.A. 2C:20-2; and speculating or wagering on official action or information, N.J.S.A. 2C:30-3; or the conspiracy to commit any of these offenses, all of which must be commenced within seven years after the commission of the offense, N.J.S.A. 2C:1-6b(3), a prosecution for a crime must be

18

commenced within five years after it is committed, N.J.S.A. 2C:1-6b(1). An offense is committed when every element of the offense occurs or "at the time when the course of conduct or the defendant's complicity therein was terminated [when it] plainly appears" that the Legislature intended to prohibit a continuing course of conduct. N.J.S.A. 2C:1-6c. The time commences to run on the day after the offense is committed, except in circumstances not implicated in this appeal. Ibid.

The statute of limitations for a criminal offense is an absolute bar to prosecution. State v. Short, 131 N.J. 47, 55 (1993). Therefore, if the charges are not filed within five years from the day after the offense is committed, any prosecution is barred. See Zarinsky, supra, 75 N.J. at 107.

In this appeal, we must determine whether the indictment was filed within five years of the commission of the charged offenses: theft by deception and money laundering. According to the record, defendant ordered produce, diverted the produce to another distributor, sold the produce but failed to pay the suppliers. Although preparatory steps commenced in March 1999, the many instances of receipt and acceptance of produce and failure to pay commenced in October 1999 and continued through January 2000. Fava and defendant deposited cash into the PFP account in March 2000 and defendant provided $45,000 in cash to Menadier to settle a lawsuit on March 17, 2000. The indictment

was returned on February 1, 2005. Our determination whether the indictment was timely requires us to consider whether the charged offenses are continuing offenses and, if so, when the last act of the continuing offense occurred.

A criminal offense is often classified as either a discrete act or a continuing offense. "A discrete act" is one that occurs at a single point in time. State v. Williams, 129 N.J. Super. 84, 86 (App. Div. 1974), rev'd on other grounds, 68 N.J. 54 (1975). Robbery is such an offense. A continuing offense involves conduct spanning an extended period of time and generates harm that continues uninterrupted until the course of conduct ceases. State v. Ireland, 126 N.J.L. 444, 445 (Sup. Ct. 1941), appeal dismissed, 127 N.J.L. 558 (E. & A. 1942). For example, possession of a controlled substance is considered a continuous offense. No New Jersey case holds that separate days of continuous criminal possession will support separate convictions. Cannel, New Jersey Criminal Code Annotated, comment 8 on N.J.S.A. 2C:1-8 (2013); see also United States v. Fleischli, 305 F.3d 643, 658 (7th Cir. 2002) (holding that possession of firearm is considered continuing offense which ceases only when possession stops), cert. denied, 538 U.S. 1001, 123 S. Ct. 1923, 155 L. Ed. 2d 828 (2003). On the other hand, separate instances of possession of a banned substance are discrete acts. Williams, supra, 129 N.J. Super. at 86.

20

Kidnapping is considered a continuing offense because the risk of harm to the victim persists until safe release. United States v. Garcia, 854 F.2d 340, 343-44 (9th Cir. 1988), cert. denied, 490 U.S. 1094, 109 S. Ct. 2439, 104 L. Ed. 2d 995 (1989).

In Toussie, supra, 397 U.S. at 114-16, 90 S. Ct. at 860-61, 25 L. Ed. 2d at 161-62, the Supreme Court declared that the doctrine of continuing offenses should be applied only in limited circumstances. An offense should not be considered a continuing offense "unless the explicit language of the substantive offense compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." Ibid.

The New Jersey Code of Criminal Justice (Code) "establishes a presumption against finding that an offense is a continuous one." II The New Jersey Penal Code, Final Report of the N.J. Criminal Law Revision Commission § 2C:1-6 commentary 2 at 15 (1971) (hereinafter Final Report). However, the Code expressly recognizes the existence of continuing offenses, N.J.S.A. 2C:1-6c, and the Law Revision Commission declared that "[t]o the extent that a given offense does in fact proscribe a continuing course of conduct, no violence is done to the statute of limitations." Id. at 16.

This Court has addressed continuing offenses in the context of an official misconduct charge and an attempted extortion charge. State v. Weleck, 10 N.J. 355 (1952). Weleck pre-dates not only the Code but also Toussie, but remains relevant to our inquiry because it is the only opinion by this Court addressing continuing offenses. Moreover, although Toussie is persuasive authority and widely accepted, it is not binding authority as it governs only federal criminal prosecutions based on federal law.

In Weleck, the Court recognized that "[a]n indictment for misconduct in office may allege a series of acts spread across a considerable period of time . . . . If any of the acts fall within the two years next preceding the return of the indictment, prosecution is not barred by the statute of limitations." Id. at 374 (citations omitted). Therefore, when the borough attorney demanded money and entered into an illegal agreement with a private citizen, those acts "constituted a breach of [the defendant's] duties [as borough attorney] and the breach continued so long as the defendant held office and persisted in his efforts to obtain the money from [the private citizen]." Ibid.

On the other hand, the Court held that the charges of attempted extortion and extortion cannot be considered continuing offenses. Id. at 374. Rather, the offense of extortion is complete with the taking and the offense of

22

attempted extortion is complete with the demand for payment not due to the defendant.  Id. at 375.  Each demand for payment not due to the public official is a separate offense.  Ibid. Consistent with Toussie, Weleck, and N.J.S.A. 2C:1-6c, our task then is to determine whether the Legislature explicitly declared these offenses as continuing offenses or the nature of either offense is one that the Legislature must have intended that it be treated in this manner.

A.

We first assess whether N.J.S.A. 2C:20-4 is a continuing offense for the purpose of the statute of limitations.

> A person is guilty of theft if he purposely obtains property of another by deception.  A person deceives if he purposely:
>
> a. Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind, and including, but not limited to, a false impression that the person is soliciting or collecting funds for a charitable purpose; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
>
> b. Prevents another from acquiring information which would affect his judgment of a transaction; or
>
> c. Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

23

[N.J.S.A. 2C:20-4.]

"Amounts involved in thefts . . . committed pursuant to one scheme or course of conduct, whether from the same person or several persons, may be aggregated in determining the grade of offense." N.J.S.A. 2C:20-2b(4) (emphasis added). See Cannel, supra, comment 3 on N.J.S.A. 2C:20-4 (noting that aggregation premised on continuing nature of illegal conduct).

This Court has never addressed whether theft by deception is a continuing offense so that the statute of limitations commences to run only when the course of conduct is complete. In State v. Childs, 242 N.J. Super. 121, 134 (App. Div.), certif. denied, 127 N.J. 321 (1990), and State v. Jurcsek, 247 N.J. Super. 102, 110 (App. Div.), certif. denied, 126 N.J. 333 (1991), the Appellate Division determined that theft by deception is a continuing offense for purposes of the statute of limitations when the defendant is engaged in a continuing scheme or course of behavior to obtain funds by deception. In Childs, supra, the defendant raised cash for his corporation by making false representations to induce investors to lend money in exchange for unsecured corporate notes that had no value. 242 N.J. Super. at 125-27. In Jurcsek, supra, the defendant implemented a fraudulent scheme to obtain bank funds in the form of student loans on a recurring basis. 247 N.J. Super. at 110; accord State v. Tyson, 200 N.J. Super. 137, 139 (Law Div. 1984)

24

(receipt of three forms of public financial assistance based on periodic certifications over nine years is continuing offense). Based on these cases, the Appellate Division recently concluded that our "[c]ourts have found a plain appearance that the Legislature intended to prohibit a continuing course of conduct in situations involving a common scheme of ongoing conduct and where, by the terms of the statute prohibiting the conduct, the amounts involved can be aggregated to form a single offense." State v. Coven, 405 N.J. Super. 266, 276 (App. Div. 2009).

In the typical case, the offense is complete as soon as every element of the offense occurs. Several discrete acts of theft by deception would not be a continuing offense because the harm caused by each theft would cease upon completion of each offense. On the other hand, if "the crime is not exhausted for purposes of the statute of limitations[,] as long as the proscribed course of conduct continues," it is a continuing offense. Toussie, supra, 397 U.S. at 124, 90 S. Ct. at 865, 25 L. Ed. 2d at 167 (White, J., dissenting). Thus, the offense of official misconduct premised on an agreement between a borough attorney and a private citizen for the attorney to use his influence to guide legislative action for the benefit of the private citizen is a continuing offense. Weleck, supra, 10 N.J. at 374. This is so because the public official can influence the legislative business of the borough for the benefit of a

25

party other than the public entity as long as he is in office and the matter is before the governing body. By contrast, the offense of extortion is complete when money is demanded and taken. Id. at 375.

We discern from these cases the need to scrutinize the statute to determine the conduct that is prohibited. We do so because the Legislature has not expressly stated that theft by deception is a continuing offense as it has done in N.J.S.A. 2C:20-8c (connecting or causing to be connected a device to obtain gas, electric or water without payment) or N.J.S.A. 2C:20-8d (tampers with devices that record electric usage).[5] N.J.S.A. 2C:20-4 also does not contain language describing the circumstances when a litany of single offenses might constitute a continuing offense. Furthermore, the Legislature has declared that the various theft offenses addressed in Chapter 20, N.J.S.A. 2C:20-1 to -38 are generally single offenses. N.J.S.A. 2C:20-2a. Nevertheless, the Legislature has declared that the amounts involved in thefts may be aggregated to determine the grade of the offense when the thefts are part of "one scheme or course of conduct, whether from the same person or several persons." N.J.S.A. 2C:20-2b(4). This approach undoubtedly

---

[5] The Legislature amended each statute in 1985 to expressly provide that each was a continuing offense, L. 1985, c. 20, § 1, following an Appellate Division opinion holding to the contrary. State v. Insabella, 190 N.J. Super. 544, 553-54 (App. Div. 1983).

26

reflects recognition by the Legislature that theft by deception is not always an isolated event but may actually be a complex scheme involving many persons or businesses and play out over the course of many days, weeks, months, or even years.

We hold that the scheme devised and implemented by defendant comprised a continuing offense. In reaching this conclusion, we are mindful that a continuing offense is not the norm. Although most theft by deception offenses are not continuing offenses, here, the scheme developed and implemented by defendant never contemplated a single act of theft by deception. Rather, the scheme depended on a series of actions to create the impression that PFP was a legitimate business engaged in the wholesale distribution of fresh produce and had the ability to pay its financial obligations in a timely manner as required by federal law. Having created the impression of a legitimate and financially responsible produce business, it initiated a course of conduct that did not cease until suppliers refused to provide any more produce. It placed multiple orders from fourteen wholesalers. Those wholesalers shipped produce under the impression, carefully cultivated by defendant, that they would be paid. Rather, defendant shipped the produce from the PFP warehouse to produce businesses he and co-defendant Fava controlled almost as fast as it arrived. Defendant commingled and sold the produce ordered by PFP with the produce purchased

27

by companies owned or controlled by co-defendant Fava. Little of the sums realized from the sale of PFP-acquired produce was ever returned to PFP's accounts and ultimately to the fourteen produce suppliers. Their losses exceeded $1.7 million.

Here, defendant devised and orchestrated a single scheme to defraud several businesses. The evidence adduced at trial demonstrates that every act taken by defendant and his business associates was to further the single scheme that produced on-going harm to a targeted group of victims. We, therefore, hold that when a defendant engages in a course of conduct or single scheme to obtain property of another by deception from one or several persons, that conduct is a continuous offense for purposes of the statute of limitations.

Having determined that the conduct devised by defendant qualifies as a continuing offense, we must determine when the last constituent act occurred. That inquiry in this case requires us to determine whether the last act is the receipt and acceptance of the produce or the failure to pay for the produce.

A person cannot be convicted of theft by deception unless he has obtained the property of another by purposely creating a false impression. N.J.S.A. 2C:20-4; see also State v. Mejia, 141 N.J. 475, 495 (1995) (holding that for act to constitute theft, stolen property must "belong to another"), overruled on other grounds by State v. Cooper, 151 N.J. 326, 378 (1997). The

28

term "obtain" is defined as a transfer of a legal interest in the property.  N.J.S.A. 2C:20-1f.  The term "property" and "property of another" are defined broadly to include "anything of value."  N.J.S.A. 2C:20-1h.  Thus, a builder who induced lenders to give him money based on false impressions which the builder created was guilty of theft by deception and the offense was complete when he received the funds which would not have been advanced but for his falsification of documents.  State v. Rodgers, 230 N.J. Super. 593, 601-02 (App. Div.), certif. denied, 117 N.J. 54 (1989).  Based on these principles, defendant contends he obtained the property of another when he received the produce for suppliers on credit, and the last shipment arrived on January 12, 2000.  Therefore, the indictment is not timely.  The State responds that the last act occurred when PFP failed to pay for the produce in accordance with the purchase agreement for the last shipments and that the record reveals that payment for the final shipments was not due until after February 1, 2000.

The majority of jurisdictions that have addressed this issue have held that the statute of limitations for comparable theft offenses begins to run at the time of the receipt of property.  William A. Harrington, When statute of limitations begins to run against criminal prosecution for embezzlement, fraud, false pretenses, or similar crimes, 77 A.L.R.3d 689, 694

29

(2009) (noting that in most cases involving prosecutions for crimes of theft involving fraud, "the limitation period was held to begin when the misappropriation or misuse of funds or property by the accused took place"). Although a minority of jurisdictions hold that the statute of limitations begins to run when the victim becomes aware of the fraud, see Harrington, supra, 77 A.L.R.3d at 712 (discussing cases "holding that statute begins to run on occurrence of event after misappropriation of funds or property"), this theory is inconsistent with our Code. Our "Code is drafted on the theory that it is ordinarily desirable to start the running of the period of limitation at the time when a crime is committed rather than at the time the offense is detected or the offender discovered." Final Report, supra, § 2C:1-6 commentary 2 at 14.

Here, the Appellate Division held that the last act occurred when PFP breached its contractual obligation to pay for the produce. Diorio, supra, 422 N.J. Super. at 459. The appellate court relied on a dissent in Rosborough, supra, 909 So. 2d at 776-78. Ibid. In Rosborough, the Supreme Court of Alabama held that any deceptive acts subsequent to the taking of the property did not constitute theft by deception, id. at 775-76, and concluded that the limitation period began to run when Rosborough obtained funds for an investment that contemplated

30

monthly interest payments and a return of principal after five years, id. at 776.

In his dissenting opinion,[6] Chief Justice Nabers agreed with the majority that a deception must logically precede obtainment of the property in a theft by deception offense. Id. at 776-77 (Nabers, C.J., dissenting). However, the justice noted that the case involved "a theft conceived and carried out through a contract, which by its terms continued beyond the theft and provided cover for Rosborough's deception." Id. at 779. Focusing on the terms of the contract, Chief Justice Nabers noted:

> I would hold that in a theft-by-deception case where property is obtained pursuant to a continuing and deceptive scheme set forth in a contract crafted to effectuate the transfer of the property and to cover up the theft through means [statutorily] defined as "deception[,]" . . . the statute of limitations does not begin to run until the thief has completed his "final act" of performance under the contract.
>
> [Ibid. (internal citations omitted).]

Applying this "final act" theory, Chief Justice Nabers concluded that the statute of limitations began to run when Rosborough made his last deceptive payment. Ibid.

---

[6] Three other justices also dissented writing separate opinions. Each agreed that the last act that triggered the statute of limitations was the failure to make an interest payment as prescribed in the agreement. Id. at 779-82.

The reasoning of the Rosborough dissent is sound when the scheme involves the purchase and delivery of a product followed by payment at a later date.  In other words, the property supplied on credit has not been stolen until a defendant does not pay for it in accordance with the terms of the credit agreement.  We hold, therefore, that when property is transferred from one to another on a promise to pay at a designated later date, the person supplying that product has not been harmed until the date for payment has passed.  The statute of limitations commences to run the day following the date payment is due.

B.

We next consider whether N.J.S.A. 2C:21-25b is a continuing offense for the purposes of the statute of limitations.

The money laundering statute provides that a person is guilty of the crime if he:

> engages in a transaction involving property known or which a reasonable person would believe to be derived from criminal activity
>
> (1) with the intent to facilitate or promote the criminal activity; or
>
> (2) knowing that the transaction is designed in whole or in part:
>
> (a) to conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity; or

32

> (b) to avoid a transaction reporting requirement under the laws of this State or any other state or of the United States.
>
> [N.J.S.A. 2C:21-25b.]

For a transaction to constitute an act of money laundering, the property involved in the transaction must have been derived from criminal activity. Cannel, supra, comment on N.J.S.A. 2C:21-23 (noting that money laundering statute is intended to "punish[] any possession of property known to be derived from criminal activity"). "Thus, the statute requires two 'transactions,' (1) the underlying criminal activity generating the property, and (2) the money-laundering transaction where that property is either (a) used to facilitate or promote criminal activity, or (b) concealed, or 'washed.'" State v. Harris, 373 N.J. Super. 253, 266 (App. Div. 2004), certif. denied, 183 N.J. 257 (2005).

Similar to the theft by deception offense, the "[a]mounts involved in transactions conducted pursuant to one scheme or course of conduct may be aggregated in determining the degree of the offense." N.J.S.A. 2C:21-27(a). As we noted previously, offenses that allow for aggregation of amounts in determining the degree of the offense are considered continuing offenses. See Coven, supra, 405 N.J. Super. at 276.

We note that federal law appears divided on whether money laundering under 18 U.S.C.A. § 1956 is a continuing offense. The United States Court of Appeals for the Second Circuit adopts

33

a presumption that "criminal charges may aggregate multiple individual actions that otherwise could be charged as discrete offenses as long as all of the actions are part of a 'single scheme.'" United States v. Moloney, 287 F.3d 236, 240 (2d Cir.), cert. denied, 537 U.S. 951, 123 S. Ct. 416, 154 L. Ed. 2d 297 (2002). Other federal courts have held that money laundering is not a continuing offense and that each money laundering transaction is a separate violation of the money laundering statute. See, e.g., United States v. Majors, 196 F.3d 1206, 1212 n.14 (11th Cir. 1999) (rejecting presumption in favor of allowing common scheme to be treated as part of single offense), cert. denied, 529 U.S. 1137, 120 S. Ct. 2022, 146 L. Ed. 2d 969 (2000); United States v. Kramer, 73 F.3d 1067, 1072 (11th Cir. 1996) (finding that statutory language and legislative history of 18 U.S.C.A. § 1956(a)(2) indicates each transaction constitutes separate offense). A federal district court judge in New Jersey has also held that "[e]ach money laundering transaction constitutes a separate violation" of the federal money laundering statute. United States v. Blackwell, 954 F. Supp. 944, 956 (D.N.J. 1997).

The New Jersey money laundering statute, N.J.S.A. 2C:21-25b, has been read broadly. In Harris, supra, the Appellate Division, as a matter of first impression, considered whether stolen funds that were not laundered so as to disguise the

34

illicit source could be considered an act of money laundering.
373 N.J. Super. at 256. The defendant argued "that illegitimate
money cannot be considered laundered unless it is generated in a
distinct transaction separate from the laundering transaction."
Id. at 261. The court, noting the broad scope of the money
laundering statute, rejected this argument and held that money
laundering encompasses "any possession of property known to be
derived from criminal activity with the intention to promote
further criminal activity." Id. at 256. In its analysis, the
court noted the Legislature's intent to dissuade and prohibit
"'money laundering conduct in any form.'" Id. at 264 (quoting
Assembly Judiciary, Law and Public Safety Committee, Statement
to Assembly Bill No. 889 (June 13, 1994) (hereinafter Assembly
Statement No. 889)). The court noted that N.J.S.A. 2C:21-25 is
not narrowly confined to the sanitization of illicit funds but
that the statute also contains a "facilitation or promotion
prong." Id. at 266. The appellate court then reviewed the
evidence that revealed the defendant's active participation in
the fraudulent scheme and her receipt of the fraudulent gains.
Id. at 266-67. Specifically, the appellate panel found that the
defendant used the illicit funds to purchase property, secure
fraudulent mortgages, and write checks. Ibid.

The Appellate Division also rejected the defendant's
argument that a specific crime must underlie the money

laundering offense.  Id. at 267.  The panel noted that the "New Jersey statute does not require that a particular crime be set in motion.  Any 'criminal activity' will suffice."  Ibid. (citing State v. One 1994 Ford Thunderbird, 349 N.J. Super. 352, 373 (App. Div. 2002)).  Thus, the court held that an "independent predicate offense is not necessary to the prosecution of the promotion prong of New Jersey's money laundering statute.  Proceeds of a criminal activity may be derived from an already completed offense or a completed phase of an ongoing offense."  Ibid. (citing United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994)).  Finally, the court noted that the proceeds from the earlier fraud do not have to promote the subsequent fraud in order to constitute money laundering.  Id. at 269 (citing United States v. Paramo, 998 F.2d 1212, 1215-16 (3d Cir. 1993) (holding that "past, future or ongoing fraud" may all "suffice as the unlawful activity promoted"), cert. denied, 510 U.S. 1121, 114 S. Ct. 1076, 127 L. Ed. 2d 393 (1994)).

The broad scope of the money laundering statute, as well as the legislative intent to "stop the conversion of ill-gotten criminal profits" and to impose criminal sanctions "to deter and punish those who are converting the illegal profits, those who are providing a method of hiding the true source of the funds, and those who facilitate such activities," N.J.S.A. 2C:21-23e (discussing public policy of money laundering statute), has been

36

noted.  The Assembly Judiciary, Law and Public Safety Committee also noted the broad reach of the statute as it is "designed to confront the [financial facilitation of criminal activity] by prohibiting money laundering conduct in any form [and] increasing criminal penalties by allowing treble damages to be assessed by a sentencing court."  Assembly Statement No. 889, supra.  Commentators have further acknowledged the broad scope of the money laundering statute.  See James B. Johnston, Article: An Examination of New Jersey's Money Laundering Statutes, 30 Seton Hall Legis. J. 1, 20 (2005).  The broad scope of the statute supports the proposition that money laundering may be a continuing offense when there are successive acts that promote, facilitate, and further a common scheme to disguise the illicit source of funds.  We, therefore, conclude that the charge of money laundering is a continuing offense for the purposes of the statute of limitations but only when the record contains evidence of successive acts that facilitate and promote the common scheme to defraud.

VI.

Applying these principles, we now turn to the specific charges against defendant: theft by deception and money laundering.  We must determine whether the indictment was returned within five years of commission of the last element of each offense.

37

To determine whether the theft by deception charge was timely filed, we must establish the date of the last constituent theft that was committed as part of defendant's bust-out scheme. The parties and the Appellate Division disagree as to when the last theft occurred for the purposes of the statute of limitations. Defendant argues that the last theft occurred on January 12, 2000, when PFP received its last produce shipment.[7] The State argues that the theft continued so long as defendant engaged in deceptive conduct that allowed defendant to retain control over PFP's profits, which continued until January 2001. The appellate panel rejected both of these arguments and determined that the last act of theft occurred in February 2000, when defendant breached his contractual agreement to pay PFP's creditors within thirty days of receipt of the produce ordered in January 2000. Diorio, supra, 422 N.J. Super. at 458-59 (citing Rosborough, supra, 909 So. 2d at 776).

In resolving the timeliness of the indictment, we must recognize that the interstate purchase and shipment of produce is highly regulated. Those who engage in the interstate sale of fresh produce as a commission merchant, dealer or broker are required not only to obtain a license, 7 U.S.C.A. § 499c(a), but

---

[7] Defendant implicitly, if not explicitly, has rejected Fava's testimony that PFP ordered produce after January 18, 2000, the date he deposited some cash in the PFP business account.

also to refrain from unfair conduct, including the failure or refusal to "make full payment promptly" for any transaction, 7 U.S.C.A. § 499b(4). Failure to make full payment promptly by a broker is defined as failure to pay within ten days of acceptance of the produce, 7 C.F.R. § 46.2(aa)(5), unless the parties have agreed in writing in advance of the transaction to different payment terms, 7 C.F.R. § 46.2(aa)(11).

The Appellate Division correctly determined that the last act of theft occurred when defendant breached his contractual agreement to pay creditors in accordance with the agreed payment terms for produce received. The evidence adduced at trial reveals that the scheme implemented by defendant ceased when suppliers refused to accept orders due to the non-payment of their accounts. The appellate panel identified thirty days as the time within which payment was due for the last shipment of produce. The record, however, does not support that payment term. Rather, one supplier testified that its payment terms were ten days; another testified its payment terms were fourteen days. The State did not establish the payment terms for the produce shipped on January 11 or 12, 2000. Having no evidence of a written agreement varying the prescribed payment term, we must assume that payment was due from PFP ten days after receipt and acceptance of the produce. 7 C.F.R. § 46.2(aa)(5). The

39

record contains evidence that produce shipments normally took four to five days to reach PFP.

Our review of the record indicates that the last shipment from a supplier to PFP occurred on January 12, 2000. Assuming five days transit, payment was due on January 27, 2000. PFP did not make this payment. For purposes of the statute of limitations, the failure to pay for the final shipment by January 27, 2000, is the last constituent theft. We therefore conclude that the statute of limitations on the theft by deception offense expired before the indictment was returned on February 1, 2005, and that the prosecution of defendant for that offense is accordingly barred.

B.

We next consider whether the money laundering charge was timely filed. The State presented evidence of two transactions that occurred after February 1, 2000: (1) a deposit of $5,639.81 into PFP's Fleet Bank account on February 4, 2000; and (2) the transfer of $45,000 in cash in March 2000 from defendant to Menadier's personal bank account for the Bushman settlement. Defendant contends that neither of these transactions facilitated or promoted the criminal activity of theft by deception because the last theft occurred in January 2000. Defendant argues that a transaction facilitating a theft must logically occur prior to the actual theft. The State responds

40

that both transactions constitute an act of money laundering because they promoted defendant's criminal enterprise by settling the debts incurred from the bust-out scheme.

We conclude that the $45,000 cash transaction in March 2000 between defendant and Menadier is a transaction facilitating or promoting the criminal activity. N.J.S.A. 2C:21-25b(1). This cash transaction, deposited into Menadier's personal bank account and then subsequently withdrawn in order to obtain a cashier's check to pay a settlement to satisfy an $85,279.35 debt to Bushman, enabled defendant to retain a portion of the profits from the bust-out scheme. Finally, we reject defendant's argument that each transaction must involve monies derived from a predicate offense that has already occurred. Harris, supra, 373 N.J. Super. at 267. Here, the evidence reveals a unitary and on-going scheme to defraud creditors and to hide the proceeds of the scheme. Because these transactions occurred within five years before the indictment was filed, the money laundering charge was timely filed.

VII.

We need not dwell long on defendant's final argument: that his motion for a new trial should have been granted because the trial judge violated Rule 3:7-3 and denied defendant's right to procedural due process when the judge identified Menadier in the jury instructions as the previously unnamed co-conspirator. The

41

testimony adduced at trial established that the bust-out scheme had three participants, defendant, Fava, and Menadier.  In addition, Menadier testified at trial and was subject to extensive cross-examination by defendant.  Defendant could have suffered no prejudice from this portion of the jury instruction.

## VIII.

The judgment of the Appellate Division is affirmed in part, and reversed in part.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUDGE CUFF's opinion.

SUPREME COURT OF NEW JERSEY

NO. __A-110__                              SEPTEMBER TERM 2011

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


STATE OF NEW JERSEY,

      Plaintiff-Respondent,

          v.

JOSEPH DIORIO,

      Defendant-Appellant.


DECIDED      February 12, 2014
         Chief Justice Rabner          PRESIDING

OPINION BY     Judge Cuff (temporarily assigned)

CONCURRING/DISSENTING OPINIONS BY _____

DISSENTING OPINION BY _____

| CHECKLIST | AFFIRM IN PART/REVERSE IN PART | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |